# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NOREEN HULTEEN; ELEANORA
COLLET, LINDA PORTER; ELIZABETH
SNYDER; COMMUNICATIONS
WORKERS OF AMERICA,
     *Plaintiffs-Appellees,*

v.

AT&T CORPORATION,
     *Defendant-Appellant.*

No. 04-16087

D.C. No.
CV-01-01122-MJJ

OPINION

Appeal from the United States District Court
for the Northern District of California
Martin J. Jenkins, District Judge, Presiding

Argued and Submitted
October 20, 2005—San Francisco, California

Filed March 8, 2006

Before: Stephen S. Trott, Pamela Ann Rymer, and
S. Jay Plager,* Circuit Judges.

Opinion by Judge Plager;
Dissent by Judge Rymer

---

*The Honorable S. Jay Plager, Senior Circuit Judge for the Federal Circuit, sitting by designation.

## COUNSEL

Joseph R. Guerra (argued) and Joseph Palmore, Sidley Austin Brown & Wood LLP, Washington, D.C.; Charles C. Jackson and Allegra R. Rich, Seyfarth Shaw LLP, Chicago, Illinois; Laura A. Kaster and Valerie Fant Custer, AT&T Corporation, Bedminster, New Jersey, for the defendant-appellant.

M. Suzanne Murphy (argued) and Blythe Mickelson, Weinberg, Roger & Rosenfeld, Oakland, California; Henry S. Hewitt, Erickson, Beasley, Hewitt & Wilson, Oakland, Cali-

fornia; Noreen Farrell, Equal Rights Advocates, San Francisco, California; Judith E. Kurtz, San Francisco, California, Mary K. O'Melveny, Communications Workers of America, AFL-CIO, Washington, D.C., for the plaintiffs-appellees.

Paul D. Ramshaw, U. S. Equal Employment Opportunity Commission, Washington, D.C., for amicus Equal Employment Opportunity Commission.

## OPINION

PLAGER, Circuit Judge:

This is a Title VII Civil Rights case.[1] It requires us to decide whether AT&T, in making current retirement benefits determinations, discriminates in violation of Title VII against women who took pregnancy-related leaves before 1979. 1979 was the year when the Pregnancy Discrimination Act of 1978 (PDA), an amendment to Title VII, became effective.[2]

Prior to the PDA, an AT&T employee on pregnancy leave was not awarded service credit for the entire period of her

---

[1] 42 U.S.C. § 2000e et seq.

[2] Title VII makes it an unlawful employment practice for an employer to discriminate against any individual because of such individual's sex. 42 U.S.C. § 2000e-2(a). Congress amended Title VII in 1978 to provide:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise.

42 U.S.C. § 2000e(k).

absence, whereas employees on other temporary disability leaves received full service credit for that time period. Although AT&T today awards full credit for pregnancy leaves, plaintiffs in this case, four female employees and the Communications Workers of America (CWA), complain that the company's failure to give employees full service credit for their pre-PDA leaves affects their eligibility for and computation of retirement benefits and is therefore a present violation of the PDA. AT&T marshaled a number of arguments based on the current state of the law.

The district court, while acknowledging the "great logical and legal force" of AT&T's arguments, felt compelled by this court's decision in *Pallas v. Pacific Bell*, 940 F.2d 1324 (9th Cir. 1991), to conclude that AT&T's post-PDA benefits determinations violated the PDA. The district court therefore granted summary judgment in plaintiffs' favor on their Title VII claims. Because the result reached by the district court gives the PDA impermissible retroactive effect under controlling law today, we reverse the judgment of the district court.

## BACKGROUND

Noreen Hulteen, Eleanora Collet, Linda Porter, and Elizabeth Snyder were long-time employees of Pacific Telephone and Telegraph (PT&T), a Bell System operating company that was transferred to AT&T when the former Bell system was broken up in 1984. They continued to work for AT&T thereafter. PT&T and, in turn, AT&T maintain a "Net Credited Service" (NCS) date for all employees. The NCS date consists of an employee's original hire date and adjustments for periods during which no service credit is accrued. Periods of leave or other breaks in service that are not credited result in a later NCS date than the employee's original hire date. The NCS date is used to determine benefits for which employees may qualify, including the amount of pension payments, eligibility for early retirement, qualification for voluntary termina-

tion packages, job bidding, shift preferences, and seniority for layoffs.

Hulteen, Collet, Porter and Snyder took pregnancy leaves between 1968 and 1976. Before August 7, 1977, PT&T treated pregnancy leaves as personal leaves for which the employee was given a maximum of 30 days of service credit; at the same time, employees on disability leave for reasons other than pregnancy received full service credit for the entire period of their absence. Also, female employees who took a personal leave because of pregnancy and became temporarily disabled while on that leave for reasons unrelated to pregnancy were ineligible for sickness or disability benefits or for NCS credit in excess of 30 days. On August 7, 1977, PT&T adopted the Maternity Payment Plan (MPP) under which pregnant employees could begin a pregnancy leave at any mutually convenient time and were eligible for disability benefits for up to six weeks of leave. They received service credit for this period, but beyond this, absence became a personal leave. Employees whose pregnancy-related disability lasted longer than six weeks and who then had a second disability received no service credit for the period of the second disability. Employees on non-pregnancy-related disability leave received full service credit for the entire period of their disability absence, including for leave resulting from disability for a different reason from the initial disability.

On April 29, 1979, the effective date of the PDA, PT&T adopted the Anticipated Disability Plan (ADP), which superseded the MPP and provided service credit for pregnancy leaves on the same basis as leaves taken for other temporary disabilities. No adjustment was made to the service credit calculations of employees who had been subject to pre-MPP policies when the MPP was adopted, or for pre-ADP calculations when the ADP was adopted.

In 1982 the United States District Court for the District of Columbia entered a consent decree and Modified Final Judg-

ment to resolve the government's antitrust suit against AT&T. *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd sub nom., Maryland v. United States*, 460 U.S. 1001 (1983). Among other things, the judgment required recognition of pre-divestiture employment service by the newly-created regional telephone holding companies and their subsidiaries, including PT&T. It resulted in a Plan of Reorganization that was approved by the court in 1983. *United States v. Western Elec. Co.*, 569 F. Supp. 1057 (D.D.C. 1983), *aff'd sub nom., California v. United States*, 464 U.S. 1013 (1983). The Plan of Reorganization specifies that "all employees will carry with them all pre-divestiture Bell System service regardless of the organizational unit or corporation by which they are employed immediately after divestiture." It also states that "[a]ll employees and retirees of any pre-divestiture Bell System entity will have the same pension benefit entitlements immediately after divestiture as they had immediately prior to divestiture under the existing [Bell System pension plans]."

Over the years, collective bargaining agreements between AT&T and the CWA have contained provisions recognizing the use of NCS as established by company practice to determine various employment-related benefits. AT&T has continued to utilize employees' NCS dates as the basis for computing benefits and determining other rights negotiated in collective bargaining agreements.

Hulteen's employment was terminated June 1, 1994 through a reduction in force; Collet retired early under a Voluntary Retirement Incentive Program on December 31, 1998; Porter is a current employee who has not yet retired; and Snyder voluntarily terminated her employment on April 28, 2000 pursuant to a Voluntary Termination Plan. Calculation of their benefits or the date of their retirement opportunities would have been more favorable had AT&T or PT&T credited some or all of the previously uncredited time they were off work due to pregnancy leaves prior to 1979.

Each filed a charge with the Equal Employment Opportunity Commission (EEOC). The first of these charges was filed in 1994. The EEOC issued a Letter of Determination finding reasonable cause to believe that AT&T discriminated by determining eligibility for benefits and retirement offerings based on the applicable NCS date. The CWA likewise filed a charge of discrimination on behalf of its bargaining unit employees. The EEOC issued a notice of right to sue to all claimants. Hulteen, Collet, Porter, and Snyder then filed suit in 2001 on their own behalf and on behalf of a class of similarly situated employees. The CWA joined.

The parties filed cross-motions for summary judgment on plaintiffs' Title VII claims. Although the district court found AT&T's arguments "compelling," it considered itself bound by *Pallas* and obligated to follow it. Accordingly, plaintiffs' motion was granted. The district court certified the order for interlocutory appeal, and we granted AT&T's petition for permission to appeal pursuant to 28 U.S.C. § 1292(b).

## DISCUSSION

The arguments and the briefs in this case were focused on whether the outcome is dictated by this court's 1991 *Pallas* decision. The issue before us, however, is not *Pallas*, but *Hulteen*—whether the trial court erred in this case in holding for the Hulteen plaintiffs. To sustain their Title VII cause of action, plaintiffs on appeal must do two things: one, find some way to have the pre-PDA leaves credited under post-PDA rules; and two, since the alleged unlawful practice occurred prior to 1979, find a hook on which to base their lawsuit that is recent enough to avoid the statute of limitations requiring that charges be filed with the EEOC within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). The first is the retroactivity problem; the second the statute of limitations problem.

The ultimate question to be answered in this appeal is, in light of controlling law, what is the correct result? Controlling law in this case, as in all cases governed by federal law, is what Congress has enacted and what the Supreme Court has said regarding the key matters on which the case turns. The congressional enactment at issue is Title VII, as amended from time to time. There are several recent Supreme Court decisions of direct relevance. Once we understand the terms of controlling law, we can then determine whether there is circuit precedent that is inconsistent. If so, we will have no choice but to ignore such precedent, or, to put it more delicately, conclude that such precedent is not binding.**³**

## I.   Retroactivity

**[1]** "The presumption against statutory retroactivity is founded upon sound considerations of general policy and practice, and accords with long held and widely shared expectations about the usual operation of legislation." With those words the Supreme Court in 1994 concluded a thorough review and restatement of the law governing the retroactivity of congressional enactments. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 293 (1994). Restatement may be the wrong word—'sea change' may be more accurate. Before *Landgraf*, notions such as "manifest injustice" and similar equitable phrases were all the guidance the lower courts had, not to mention lines of cases pointing in opposite directions creating what the Court referred to as an "apparent tension" between the expressions used in the cases. *Id.* at 264; *compare Bradley v. Sch. Bd. of Richmond*, 416 U.S. 696 (1974), *with Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988). After *Land-*

---

**³**It is hornbook law that decisions of circuit courts of appeals yield to conflicting decisions of the Supreme Court. Both the Ninth Circuit and the Federal Circuit, as well as other circuits, recognize that a panel is bound to follow the latter, not the former. *See Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc); *Tex. Am. Oil Co. v. United States Dep't of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995) (en banc); *Finke v. Stratton Corp.*, 962 F.2d 169, 174-75 (2d Cir. 1992).

*graf* the rules are unambiguous: in the absence of a clear expression of intent by Congress that a particular legislative enactment is to apply to events that occurred before the effective date of the legislation, the default rule is *no retroactive application*: "prospectivity remains the appropriate default rule." *Id.* at 272.[4]

As with all general rules, there are exceptions. When the issue is a court's jurisdiction, *id.* at 274, or a change in procedural rules, *id.* at 275, intervening statutes may when appropriate be applied to current cases. But when dealing with the rights and property interests of the individual,

> the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." In a free, dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions.

*Id.* at 265-66 (citation omitted).

**[2]** In the case before us, we are dealing with contractual or property rights related to established pension and other retirement obligations of the employer and benefits of the employees, rights which the Court described as "[t]he largest category of cases in which we have applied the presumption against statutory retroactivity . . . , matters in which predictability and stability are of prime importance." *Id.* at 271. Before the PDA, the counting rules applied by AT&T (and its related companies—hereafter collectively AT&T) did not grant the same degree of service credit for pregnancy leaves that were awarded other temporary disabilities. As objection-

---

[4]Though described as a "default" rule, the Court noted in *Landgraf* that there may be due process or other constitutional limitations on Congress's ability to apply legislation retroactively.

able as that may seem now, those counting rules at the time were legal, and had been expressly so held under the then-existing Title VII. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 136 (1976).

The PDA, effective in 1979, was intended to prohibit future use of that accounting distinction. Thereafter, and in accordance with the PDA, AT&T's service credit rules were amended to treat all subsequent pregnancy leaves in the same manner as other disability leaves. Plaintiffs' union, the CWA, negotiated in 1979 what it viewed as PDA-compliant service credit rules. The CWA has prospectively incorporated these service credit rules into its national collective bargaining agreements with AT&T ever since.

In order for the plaintiffs to obtain service credit for their pre-1979 pregnancy disability leaves (in excess of that amount the system then granted), i.e., for their NCS dates to be readjusted back, one of two things must happen. The employer could voluntarily decide to grant the additional credits, or the law could compel the employer to do so on the grounds that refusal to do so is a violation of law. The first obviously has not happened. The second can be arrived at by either of two theories—(1) the denial of full disability credit for the pre-1979 maternity leaves, lawful at the time, has been made unlawful as a matter of law, and must be corrected; or (2) the denial today of the *benefits* the full credits would have earned constitutes a new, post-1979, wrong. We address each of these theories in turn.

## A.

**[3]** Has there been a change in the law such as to make unlawful the denial of full disability credits for pre-1979 pregnancy leaves (taken before enactment of the PDA)? The law cited by plaintiffs as controlling this case is the PDA. There is nothing in the text of the PDA to indicate a clear congressional intent that the provisions of the statute are to be applied

in such a way as to change the legal consequences of conduct that occurred prior to the statute's enactment. The relevant conduct is the employer's practice, pre-PDA, of giving only limited service credit for pregnancy leaves, and the acceptance of that practice by the affected employees (and their union representatives). It is widely understood that there is nothing in the PDA that suggests a congressional intent to make the statute retroactive. *Wambheim v. J.C. Penney Co.*, 642 F.2d 362, 363 n.1 (9th Cir. 1981); *see also Whitehead v. Okla. Gas & Elec. Co.*, 187 F.3d 1184, 1193 (10th Cir. 1999); *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 310 n.7 (2d Cir. 1981); *Condit v. United Air Lines, Inc.*, 631 F.2d 1136, 1139-40 (4th Cir. 1980). Indeed, the most the plaintiffs could offer on this issue is that "Congress *did not* clearly intend the PDA to be prospective only." Appellees' Br. at 44 n.9. That obviously falls far short of the *Landgraf* test for congressionally-mandated retroactivity.

**[4]** As the Supreme Court explained in its *Landgraf* decision, a statute has retroactive effect when the new provision attaches new legal consequences to events completed before its enactment. Before that can happen, there must be clear congressional intent to make the statute retroactive, otherwise the default rule applies: the statute will not be given retroactive effect. Since there is an absence of clear congressional intent to the contrary, the default rule applies here and the result is that theory number 1—that the new law, the 1979 PDA, has made the pre-1979 pregnancy leave counting method unlawful—is legally without foundation and must be rejected.

## B.

Plaintiffs recognize the problem with theory number 1, and thus rest their case on theory number 2: it is not the initial crediting of the leave period that is the offense, but the later— much later—award of retirement or other benefits: "[t]he only acts alleged as unlawful here are AT&T's decisions denying

equal benefits when each of the plaintiffs and similarly situated female employees retired or were terminated *in the mid-1990s and thereafter*—decisions made *long after* the PDA came into effect." Appellees' Br. at 49. In plaintiffs' view, since the benefits are keyed to the service credits, the calculation of benefits without full credit for the pregnancy leaves, regardless of when the leaves occurred, is a current act of discrimination in violation of Title VII.

**[5]** Enforcing the requirement that pregnancy leaves be given full credit regardless of when they occurred, as plaintiffs insist, would provide an attractive result. It gives the plaintiffs the same benefits their post-PDA colleagues receive under essentially the same circumstances, and it carries forward the purpose of the change in law. In *Landgraf*, however, the Supreme Court noted the latter point, but rejected it as a basis for decision: "It will frequently be true, as petitioner and amici forcefully argue here, that retroactive application of a new statute would vindicate its purpose more fully. That consideration, however, is not sufficient to rebut the presumption against retroactivity." *Landgraf*, 511 U.S. at 285-86.

**[6]** With regard to giving the plaintiffs the same benefits their post-PDA colleagues have, that seemingly equitable resolution of the case also has problems—we must consider the consequences of such a ruling. To get that result requires that we do indirectly what we cannot do directly—make the PDA retroactive. That such a result is only reachable by a retroactive application of the PDA can be illustrated by restating plaintiffs' argument with specific reference to the facts of their case: is it unlawful to give retirement or other benefits today to some women based on full maternity disability leave credit (leaves occurring post-PDA), while denying equal benefits to women who received for their maternity leaves only partial credit (pre-PDA leaves)? If the answer is yes, that it is unlawful to have disparate benefits awarded, it can only be because the pre-PDA leaves are entitled to full, rather than partial credit. And since the pre-PDA partial leave credit sys-

tem was lawful at the time the credits were awarded, the change in their legal status must be because the later-enacted PDA has the effect of changing that status. That is retroactivity.

The key is differentiating cause from effect. If an action has the effect of causing a later consequence, and if the action, though permissible at the time, is subsequently made impermissible by a change in law, it cannot be the rule that such change will always make the consequences of the original action also impermissible. If that were the rule, every change in law would have retroactive consequences, and *Landgraf*'s presumption against retroactivity would be meaningless.

However, because cause and effect may not always be so clear in specific fact situations, and because the equities of the case may argue for a result that corrects for past discrimination, application of the rule in different cases requires careful analysis. Assume a case in which black employees are paid lower wages than white employees for equal work. A statute is passed that, prospectively, prohibits such discrimination in employment. Thereafter, though the employer no longer distinguishes between black and white employees in terms of entrance salaries, across-the-board raises, and percentage raises, some pre-existing salary disparities between blacks and whites remain and are reflected in the actual wages being received on an ongoing basis. The continuation of prior wage discrimination into current wages is not permissible: "While recovery may not be permitted for pre-1972 acts of discrimination, to the extent that this discrimination was perpetuated after 1972, liability may be imposed." *Bazemore v. Friday*, 478 U.S. 385, 395 (1986). It was the current wages reflecting racial differences that put the employer in violation of current law: "Our holding in no sense gives legal effect to the pre-1972 actions, but . . . focuses on the present salary structure, which is illegal if it is a mere continuation of the pre-1965 discriminatory pay structure." *Id.* at 396 n.6.

Contrast that case with one in which an employee is terminated from her employment for a reason (that she married) that later is declared an unlawful practice under Title VII. Later she is rehired, but the employer treats her as a new hire and refuses to grant her any seniority rights as a result of her prior employment. Plaintiff alleges, inter alia, that her current seniority status gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination. Plaintiff's suit fails:

> Respondent is correct in pointing out that the seniority system gives present effect to a past act of discrimination . . . . [The employer's] seniority system does indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists.

*United Air Lines, Inc v. Evans*, 431 U.S. 553, 558 (1977). The Court could find no current violation of Title VII by the employer. The dissent's argument, that her cause of action accrued at the time her seniority rights were recomputed after she was rehired, was unavailing. *Id.* at 561 (Marshall, J., dissenting).

[7] Admittedly, the differences among the cases are sometimes subtle, but recognizing subtle yet controlling differences is what judging is about.[5] In this case, though neither of the

---

[5]*Compare Shea v. Rice*, 409 F.3d 448, 451-53 (D.C. Cir. 2005) (holding that Title VII cause of action exists under *Bazemore* when plaintiff alleged a persistent discriminatory salary structure), *and Anderson v. Zubieta*, 180 F.3d 329, 334-37 (D.C. Cir. 1999) (holding continued application of disparate pay policy actionable under Title VII), *with Del. State Coll. v. Ricks*, 449 U.S. 250, 257-58 (1980) (holding that loss of teaching position was only the delayed consequence of allegedly discriminatory denial of tenure and was not a current Title VII violation), *and Carter v. West Publ'g Co.*, 225 F.3d 1258 (11th Cir. 2000) (holding that dividend payments resulting from earlier allegedly discriminatory practice of offering only men the opportunity to purchase company stock were not actionable wrongs under Title VII).

cases discussed above is four-square with the plaintiffs' situation, there is no *Bazemore*-type of ongoing or continuing effect felt by plaintiffs throughout their employment. The effect of that initial accounting method is felt only at the end-point, when retirement and other specific benefits are finally calculated based on those initial actions. " 'The proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful.' " *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (quoting *Abramson v. Univ. of Haw.*, 594 F.2d 202, 209 (9th Cir. 1979)). Unless we are to make the PDA apply retroactively to these plaintiffs' pre-PDA accounting—a remedy the Court denied in *Evans*—plaintiffs have failed to show a current violation of Title VII.[6]

## C.

Plaintiffs, however, have still a further argument as to why the current calculation of benefits is a violation of Title VII. They describe the NCS system as applied to them as "facially discriminatory," presumably meaning a system that treats similarly situated employees differently. In their brief before the court they make this allegation repeatedly—the quoted term appears something over fifty times in a variety of contextual formulas: e.g., "the seniority system in effect today remains facially discriminatory on the basis of pregnancy," Appellees' Br. at 32; "[AT&T] cannot claim the protection of § 703(h) [of Title VII] for employment decisions made under a 'bona fide' seniority system, because AT&T's NCS system

---

[6]*See Shea v. Rice*, 409 F.3d 448, 451-53 (D.C. Cir. 2005) (Williams, J., concurring) ("[*Nat'l R.R. Passenger Corp. v.*] *Morgan* . . . explicitly preserved *Bazemore*, which *Morgan* described as addressing 'a discriminatory salary structure.' 536 U.S. [101,] 112 [(2002)]. . . . It would be very odd to use such a term for the facts in *Evans* [or *Lorance v. AT&T Techs.*, 490 U.S. 912 (1989)] . . . . The acts [in those cases] had consequences under the employer's non-discriminatory seniority system, to be sure, but they could hardly be described as launching a two-class pay structure based on a forbidden criterion.").

is facially discriminatory," Appellees' Br. at 14. Labeling AT&T's seniority system as facially discriminatory allows plaintiffs to argue that each application of the system to calculate benefits is a new act of discrimination and thus a present violation of Title VII. *See Lorance v. AT&T Techs., Inc.*, 490 U.S. 900, 912 n.5 (1989); *Bazemore*, 478 U.S. at 395.

**[8]** The problem with plaintiffs' position that the NCS system is facially discriminatory is that it necessarily depends, again, on a retroactive application of the PDA.[7] Plaintiffs allege that, as female employees who took pregnancy leaves prior to the enactment of the PDA, they were treated differently from employees who took leave for other temporary disabilities during the same time period. These two groups, however, are not similarly situated. Employees in the latter group were not female employees who took pregnancy leaves, but were female and male employees who took other types of disability leaves and, under the lawful rules then in effect, were entitled to accrue seniority for the duration of their leaves. Female employees who took pregnancy leaves under AT&T's lawful pre-PDA policy accrued service credit only for a portion of their leaves. As earlier mentioned, though this is objectionable in light of later understandings, because it was legal to distinguish between the two reasons for leaves prior to the PDA the two groups were not similarly situated. The failure to award employees full service credit for their pregnancy leaves could be labeled facially discriminatory only if employees in both groups were similarly situated, e.g., if all were legally entitled to receive full credit for their leaves before the enactment of the PDA. But that would be true only if the PDA were given impermissible retroactive effect.

By the same token, distinguishing between one set of female employees who took pregnancy leaves post-PDA and the other set who took pre-PDA pregnancy leaves cannot con-

---

[7]*See Gilbert*, 429 U.S. at 140 (describing pre-PDA pregnancy leave practice as involving "no facial gender-based discrimination").

stitute facial discrimination either, unless the pre-PDA set is entitled to the same benefits as the post-PDA set. That can only be true if the PDA is applied retroactively to the pre-PDA accounting method. In sum, no matter how the situation of these plaintiffs is viewed, the "facially discriminatory" label can only be correctly applied by making the pre-PDA leave accounting unlawful.

AT&T, citing plaintiff's brief, offers a somewhat more technical explanation of "facially discriminatory" and why plaintiffs use of the term is inapplicable: "a policy discriminates *on its face* only 'if "discrimination is apparent from the terms of the policy itself" and does not require "referenc[e to] a fact outside the policy.' " [Appellees' Br.] at 25 (quoting *DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 727 (3d Cir. 1995))." Reply Br. at 3. AT&T argues that nothing on the face of the NCS system or AT&T's pension plans discriminates on the basis of gender or pregnancy—they simply require that pension benefits be calculated based on NCS dates. *Id.*

[9] Under either view of "facially discriminatory," plaintiffs' argument that each application of the NCS system is a new current violation of Title VII, based as it is on unsubstantiated labeling of current actions by the defendants as "facially discriminatory," is unpersuasive and must fail.

## II.  Statute of Limitations

[10] The above analysis disposes of the matter before us. The analysis also disposes of another issue in the case relating to the statute of limitations. In terms of the applicable statute of limitations, absent the 'current violation' theory which as we have seen is not available under current law, plaintiffs' cause of action, if they had one, must have arisen either (1) at the time, pre-1979, when the initial accountings for the pregnancy leaves were made (on the theory such accounting was then illegal), or (2) at the latest when the PDA became

effective in 1979 (on the theory that under pre-*Landgraf* rules the statute was retroactive). Either way, the filing of a complaint in 1994 is clearly time-barred. *See* 42 U.S.C. § 2000e-5(e)(1). For that reason, as well as the absence of retroactive effect of the PDA, plaintiffs do not have a cause of action for a violation by defendants of Title VII.[8]

### III.    *Pallas v. Pacific Bell*

We turn finally to the question of *Pallas v. Pacific Bell*, 940 F.2d 1324 (9th Cir. 1991), and its relationship to the outcome in this case. The trial court rested its judgment in plaintiffs' favor on this circuit's decision in *Pallas*, which on similar facts ruled the pre-PDA calculations non-compliant.

The *Pallas* case arose when, in 1987, Pacific Bell instituted a new retirement benefit for management employees called the Early Retirement Opportunity. Plaintiff, otherwise eligible for the benefit, was denied the benefit because under the employer's NCS system (the same system as in this case) she was several days short of the necessary service credit required to obtain the benefit. She had had a pregnancy-related leave in 1972, which under the rules in effect then (pre-PDA) was treated as a personal leave; had it been credited as other disability leaves, she would have been eligible for the retirement benefit.

Pallas sued her employer to get the missing credit. The district court dismissed her suit as time-barred—the relevant action, the pregnancy leave, had occurred in 1972 and this was now some fifteen years later. This court on appeal reversed, holding that it was not time-barred:

> In 1987, Pacific Bell instituted a program that adopted, and thereby perpetuated, acts of discrimina-

---

[8]*Accord Ameritech Benefit Plan Comm. v. Comm'n Workers of Am.*, 220 F.3d 814 (7th Cir. 2000).

tion which occurred prior to the enactment of the [PDA]. While the act of discriminating against Pallas in 1972 is not, itself, actionable, Pacific Bell is liable for its decision to discriminate against Pallas in 1987 on the basis of pregnancy. Pallas' complaint states a valid claim under Title VII.

*Pallas*, 940 F.2d at 1327.

Thus it would appear that Pacific Bell's 1987 use of the 1972 pregnancy leave accounting constituted a new and current violation of Title VII. For the reasons explained above, that necessarily implicates a retroactive application of the 1979 PDA. Stating with certainty the basis for the *Pallas* result is made awkward by the fact that the court did not address the underlying retroactive effect it had given to the PDA. Of course, *Pallas* was decided before the Supreme Court's decision in *Landgraf*, and neither the parties nor the court had the benefit of that clarification of retroactivity law.

The *Pallas* court did cite and discuss with favor the decision by the Supreme Court in *Bazemore v. Friday*. For the reasons explained earlier, we do not believe *Bazemore* is the correct analogy for the case before us. The Supreme Court in *Bazemore* focused on the pay disparities that remained after the enactment of Title VII: "Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII." 478 U.S. at 395-96. In this case there is no ongoing "pattern or practice" to be pointed to, and no current continuing violation.

## IV. Conclusion

There is little doubt that these plaintiffs and others similarly affected by the pre-PDA policies of their employer regarding pregnancy leaves were treated less generously than other employees who took disability leaves. The impact of these

policies is even more apparent in the case of an employee, like Ms. Hulteen, who, while on pregnancy leave, was hospitalized for a medical problem unrelated to her pregnancy. The employer, PT&T, denied her the unrelated disability leave to which she would otherwise have been entitled had she not already been on maternity leave.

**[11]** Deserving as these plaintiffs would seem to be of some accommodation in determining their current benefits, the question before us is not whether the employer owes these plaintiffs an accommodation, but whether the law compels it. Because the PDA cannot be applied retroactively either to invalidate the original accounting scheme for pregnancy leaves or to create a current violation of Title VII by this defendant, and because plaintiffs' suit is not based on a facially discriminatory retirement system and is thus time-barred, and because under controlling law today the *Pallas* precedent cannot be viewed as binding on this panel, we must reverse the judgment of the trial court and direct that plaintiffs' suit under Title VII be dismissed for failure to state a claim on which relief can be granted.

REVERSED.

---

RYMER, Circuit Judge, dissenting:

I reluctantly part company even though I do not disagree with my colleagues' take on what a correct analysis, on a fresh slate, should look like. As I see it, however, the slate is not clean. Like the district court, I believe that our opinion in *Pallas v. Pacific Bell*, 940 F.2d 1324 (9th Cir. 1991), controls. The parties do too, though AT&T asks us to hold that *Pallas* has since been undermined because *Pallas* impermissibly gave retroactive effect to the PDA contrary to intervening Supreme Court authority in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), relied upon the "continuing violation"

doctrine that the Supreme Court subsequently invalidated in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), and failed to apply the leading Supreme Court case addressing Title VII challenges to seniority systems, *International Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977). As I cannot accept these arguments, or play ostrich to *Pallas*, I must dissent.

I

In my view, AT&T's appeal turns entirely on whether *Pallas* is good law. If so, there is no dispute that it is controlling.

Lana Pallas had worked for Pacific Bell since 1967 and had taken leave for a pregnancy in 1972. Pacific Bell counted pregnancy leave for women employees as personal leave rather than as medical leave before the PDA was enacted, and like Pacific Telephone and Telegraph (PT&T), measured service by the "net credited service" system. Pallas applied for retirement benefits in 1987 after Pacific Bell adopted a new retirement benefit called the "Early Retirement Opportunity" for employees with twenty years of accrued service. Pacific Bell determined that Pallas was not eligible because she was several days short of the required amount of service credit as a result of her uncredited, pregnancy-related leave. Pallas filed suit under the PDA. The district court dismissed Pallas's action on the basis of Supreme Court decisions holding that disparate impacts from a bona fide seniority system that is facially neutral must be challenged within the statute of limitations from the time the system is adopted. *See, e.g., Lorance v. AT&T Technologies, Inc.*, 490 U.S. 900, 911-13 (1989) (holding that a facially discriminatory seniority system can be challenged at any time but in a facially neutral system, the discriminatory act occurs only at the time of adoption); *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 557-58 (1977) (holding that United was entitled to treat a past act of discrimination as lawful when the employee had failed to file a timely charge with the EEOC, and that the emphasis is on

whether a present violation exists instead of on mere continuity). However, we held that these cases were inapposite for two reasons: first, Pallas's complaint was about the criteria adopted in 1987 to determine eligibility for the new benefit program — not a belated attempt to litigate the legality of a pre-PDA program; and second, the NCS used to calculate eligibility under Early Retirement Opportunity was not facially neutral because it discriminates against pregnant women. This is so, we explained, because the system distinguishes between female employees who took leave prior to 1979 due to a pregnancy-related disability, and employees who took leave prior to 1979 for other temporary disabilities. Thus, in our view, the controlling precedent was *Bazemore v. Friday*, 478 U.S. 385 (1986), where the Court held that pay disparities which existed before, and remained after, enactment of Title VII were unlawful. In sum, we concluded that Pacific Bell's 1987 program "adopted, and thereby perpetuated, acts of discrimination which occurred prior to enactment of the Pregnancy Discrimination Act. While the act of discriminating against Pallas in 1972 [when she took a pregnancy-related leave] is not, itself, actionable, Pacific Bell is liable for its decision to discriminate against Pallas in 1987 on the basis of pregnancy." 940 F.3d at 1327.

A

AT&T points out that under *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc), this panel is free to overrule *Pallas* if it is undermined by supervening Supreme Court authority. There we held that "where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority." *Id.* at 893. AT&T submits that *Landgraf* is later and controlling authority with which *Pallas* is irreconcilable because *Landgraf* makes clear that *Pallas* interpreted the PDA in a way that gave the Act improper retroactive effect. AT&T reasons that the pre-PDA decision not to give

full service credit for maternity leaves was legal at the time,[1] yet *Pallas* ruled that reliance on the pre-PDA decisions in a post-PDA benefit determination was actionable because pre-PDA "acts of discrimination" were perpetuated after the Act's effective date. In this way, *Pallas* both imposed new duties on AT&T with respect to its employees' pre-PDA pregnancy-related leaves, and changed the legal consequences of how the company treated pre-PDA pregnancy leaves. As such, AT&T contends, *Pallas* contravenes *Landgraf*'s rule that a new statute has retroactive effect if it impairs rights a party possessed when it acted, increases liability for past conduct, or imposes new duties with respect to completed transactions. *Landgraf*, 511 U.S. at 280. Finally, it notes, *Pallas* did this without addressing the issue of retroactivity.

I read *Landgraf* as refining, rather than sea-changing, the landscape for the Court explicitly drew upon Justice Story's "influential definition" of retroactivity in *Society for Propogation of the Gospel v. Wheeler*, 22 F.Cas. 756, 766-69 (1814), to make clear how courts should determine whether a statute operates retroactively:

> A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule

---

[1]For this proposition AT&T relies on *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), which held that a policy of compensating for all non-job-related disabilities except pregnancy did not violate Title VII as there was no showing of discrimination. Employees take issue with the assertion that pregnancy discrimination was lawful before the PDA, noting that soon after deciding *Gilbert*, the Court invalidated a policy that favored men over women by depriving women of accumulated seniority when returning from maternity leave. *Nashville Gas Co. v. Satty*, 434 U.S. 136 (1977).

operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.

. . .

When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf*, 511 U.S. at 268, 269-70, 280 (internal citations omitted).

I do not believe that the reasoning or theory of *Pallas* is so irreconcilable with the reasoning or theory of *Landgraf* as to give this panel license to overrule it. *Pallas* held that the actionable conduct was PT&T's decision to discriminate against the employee on the basis of pregnancy when she applied for, and was denied, early retirement. The decision to deny benefits was made in the post-PDA world. As we emphasized in *United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810 (9th Cir. 1995), if "the law changes the legal consequences of conduct that takes place after the law goes into effect, the law operates on that conduct

prospectively." *Id.* at 814. This being the case, and assuming (without deciding) that Congress intended the PDA to have prospective effect only, *Pallas* was premised on a discrete act — the decision to deny a retirement benefit — that gave rise to a current violation of the PDA. Given *Pallas*'s finding of a current violation, the Act operated prospectively on *that* decision.

AT&T nevertheless argues that our post-*Landgraf* opinion in *Spink v. Lockheed Corp.*, 60 F.3d 616 (9th Cir. 1995) (*Spink I*), *overruled by Lockheed Corp. v. Spink*, 517 U.S. 882, 896-97 (1996) (*Spink II*), indicates that *Pallas*'s interpretation gives retroactive application to the PDA. *Spink* involved 1986 amendments to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, 623(i)(1), and the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1054(b)(1)(i), that prohibited employers from excluding new employees over age 60 from participating in their retirement plans. Spink had worked for Lockheed between 1939 and 1950, and began working there again in 1979 at the age of 61. He was excluded by Lockheed's retirement plan because he was over 60. After the 1986 amendments, Spink was allowed to participate in the plan, but was not credited with accrued benefits based on his years of service with Lockheed prior to the amendments' effective date. Spink sued. We held that denying credited service years that an older employee would otherwise have accumulated was unlawful under the amendments. In so doing, we observed that, "[t]o the extent our interpretation requires employers to include pre-enactment service years in calculating accrued benefits, it applies retroactively." 60 F.3d at 620, n.1. AT&T seizes upon this remark to maintain that when the Supreme Court reversed our conclusion that Congress intended the statute to have retroactive effect, it necessarily agreed that requiring employers to include pre-enactment service in calculating accrued benefits was a retroactive application. I cannot read so much into the *Spink* opinions. Our observation in *Spink I* did not affect our ultimate decision in that case because the

decision was "based on the retroactive intent of the statute manifested in its text." *Id.* The Supreme Court simply disagreed with our construction of the statute. Thus, its analysis — like ours — was limited to *Landgraf*'s first step.

In short, *Landgraf* does not control *Pallas*'s determination of what constitutes the actionable conduct, nor does it control *Pallas*'s conclusion that the NCS system is facially discriminatory. As these are the two dispositive rulings in *Pallas*, I cannot conclude that it is irreconcilable with *Landgraf*.

B

AT&T alternatively posits that *Pallas* relied on the "continuing violation" doctrine, since discredited in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), when it concluded that actions by Pacific Bell within the statute of limitations period "adopted, and thereby perpetuated" acts of discrimination which occurred before the PDA was enacted. In its view, the Supreme Court necessarily rejected *Pallas*'s particular theory of timeliness by holding that discrete discriminatory acts must be challenged within the statute of limitations period for that decision.[2] Thus, AT&T submits, *Pallas* must be overruled because, after *Morgan*, it is clear that each denial of additional service credit to women on maternity leave was a discrete incident which should have been challenged long ago, when it happened — not later, when benefit determinations were made. I disagree.

In *Morgan*, a black male filed charges with the EEOC complaining that he was "consistently harassed and disciplined more harshly than other employees on account of his race." *Id.* at 105. Some of the acts about which he complained occurred outside of the 300-day period for timely filing. We

---

[2]Title VII plaintiffs must file a charge with the EEOC either 180 or 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).

held that he could sue on claims that would otherwise be time-barred because they were "sufficiently related" to incidents within the statutory period. *Morgan v. National R.R. Passenger Corp.*, 232 F.3d 1008, 1016 (9th Cir. 2000). The Court reversed, holding instead that a discrete discriminatory act occurs on the day that it happens, that each incident of discrimination constitutes a separate actionable "unlawful employment practice," and that discrete acts are not actionable if time-barred even if they are related to acts that are not.

Neither the reasoning nor theory of *Morgan* is irreconcilable with *Pallas. Pallas* held that the NCS system is facially discriminatory, an issue that was not presented in *Morgan.* Morgan sought damages, which Pallas did not. Further, Morgan proceeded on the basis of a continuing violation, whereas Pallas relied upon PT&T's decision to deny benefits as the discrete act that was actionable. As the *Pallas* court saw it, this was a current violation, not a continuing one.

AT&T argues that *Morgan* also makes clear that *Pallas*'s reliance on *Bazemore v. Friday*, 478 U.S. 385 (1986), was misplaced. This is so, as AT&T puts it, because *Pallas* invoked *Bazemore* to support the notion that post-PDA decisions that give current effect to pre-PDA conduct "perpetuated" discrimination and are therefore actionable in and of themselves. *Pallas*, 940 F.2d at 1327. AT&T submits that *Morgan*'s reading of *Bazemore* and *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 557-58 (1977), shows that no action can arise out of a time-barred claim absent current unlawful conduct. However, correctly or incorrectly, *Pallas* found the presence of *current unlawful conduct*. Given this construct, nothing *Morgan* says about *Bazemore* or *Evans* makes *Morgan* and *Pallas* clearly irreconcilable.

In *Bazemore*, a government employer had paid white and black workers differently before Title VII was made applicable to public employees; the salary disparity continued thereafter. The Court held that a pattern or practice that would have

constituted a violation of Title VII, but for the fact that the statute had not yet become effective, became a violation upon its effective date for which the employer is liable. To this extent past discrimination was perpetuated, but as *Morgan* reiterated, " '[e]ach week's paycheck that deliver[ed] less to a black than to a similarly situated white is a wrong actionable under Title VII . . . .' " *Morgan*, 536 U.S. at 112 (quoting *Bazemore*, 478 U.S. at 395).

In *Evans*, United had forced a female flight attendant to resign in 1968 because of its "no marriage" policy. When Evans was rehired in 1972, she was subject to a different policy that denied restoration of seniority to any employee who had previously resigned. The Court rejected her argument that United was guilty of a present, continuing violation of Title VII. It held that United was entitled to treat the past act as lawful once Evans failed to file a timely charge of discrimination, and that the policy applied to her upon her rehiring was applied to male and female employees alike. Of particular importance to *Morgan* was *Evans*'s holding that "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Morgan*, 536 U.S. at 112 (citing *Evans*). This court's "continuing violation" doctrine did not square with this principle, hence the Supreme Court's clarification that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id*. at 113. At the same time, the Court did not recede from the corollary principle that employees are not barred from filing charges about related discrete acts "so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." *Id*.

Thus, *Morgan*'s take on *Bazemore* and *Evans* does not so undermine *Pallas*'s take as to render *Pallas* nonbinding. While *Morgan* changed our law on "continuing violations," it did not overrule *Bazemore*. It is not for this panel to say whether *Pallas* read *Bazemore* correctly, or correctly chose

*Bazemore* instead of *Evans* as the more apt authority. The only question for us is whether *Morgan* and *Pallas* are irreconcilable, and I cannot say that they clearly are.

Finally, AT&T notes — and I acknowledge — that the Court of Appeals for the Seventh Circuit parted company with *Pallas* in *Ameritech Benefit Plan Comm. v. Communications Workers of Am.*, 220 F.3d 814 (7th Cir. 2000). On quite similar facts (Ameritech used essentially the same NCS system as PT&T and likewise did not give service credit to women who took pregnancy-related leaves prior to the PDA), the court opted to follow *Evans* rather than *Bazemore*. We are not, of course, able to overrule one of our own precedents on the footing that colleagues on a different court came out differently.

### C

AT&T advances as a third reason for disregarding *Pallas* its failure to cite a controlling Supreme Court precedent, namely, *International Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977), which it maintains clearly foreclosed Pallas's claim because *Teamsters* immunizes neutral seniority systems from challenge even when they give present effect to acts that would be thought discriminatory if they occurred today. *Teamsters* was concerned with the "bona fide seniority system" provision of Title VII,[3] and held with respect to this provision that Congressional intent was not to outlaw the use of existing seniority lists simply because the employer had engaged in discrimination prior to passage of the Act.

---

[3]Section 703(h) of Title VII, codified at 42 U.S.C. § 2000e-2(h), provides:

> [I]t shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority system . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin. . . .

I do not need to decide whether a panel's failure to consider arguably controlling Supreme Court authority is a proper ground upon which to overrule the law of the circuit because I cannot say that *Pallas* failed to do so. Although the *Pallas* opinion does not cite *Teamsters*, it does cite *Lorance v. AT&T Technologies, Inc.*, 490 U.S. 900 (1989), which in turn cites *Teamsters*. *Lorance*, 490 U.S. at 905, 909. *Lorance* is a more recent decision in which the Court discussed the difference between a facially neutral seniority system and a facially discriminatory system, holding that a facially discriminatory system may be challenged whenever it is applied whereas a facially neutral system may be challenged only when it is adopted. *Id*. at 911-12. As *Pallas* found the NCS system to be facially discriminatory, and *Teamsters* involved a seniority system that was otherwise neutral, we are not obliged to depart from *Pallas* just because it failed to cite *Teamsters*.

II

As no acceptable basis appears to overrule *Pallas*, and AT&T offers no reason for distinguishing it, in my view *Pallas* remains binding and controls disposition of this case.