**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NOREEN HULTEEN; ELEANORA
COLLET; LINDA PORTER; ELIZABETH
SNYDER; COMMUNICATIONS
WORKERS OF AMERICA,
          *Plaintiffs-Appellees,*

          v.

AT&T CORPORATION,
          *Defendant-Appellant.*

No. 04-16087

D.C. No.
CV-01-01122-MJJ

OPINION

Appeal from the United States District Court
for the Northern District of California
Martin J. Jenkins, District Judge, Presiding

Argued and Submitted En Banc
October 4, 2006—San Francisco, California

Filed August 17, 2007

Before: Mary M. Schroeder, Chief Circuit Judge,
Stephen Reinhardt, Diarmuid F. O'Scannlain,
Pamela Ann Rymer, Michael Daly Hawkins,
Susan P. Graber, M. Margaret McKeown,
Kim McLane Wardlaw, William A. Fletcher,
Raymond C. Fisher, Ronald M. Gould, Richard A. Paez,
Marsha S. Berzon, Jay S. Bybee, and Consuelo M. Callahan,
Circuit Judges.

Opinion by Judge Wardlaw;
Dissent by Judge O'Scannlain

**COUNSEL**

Joseph R. Guerra, Sidley Austin Brown & Wood, Washington, District of Columbia, for the defendant-appellant.

Henry S. Hewitt, Erickson, Beasley, Hewitt & Wilson, Oakland, California, and Blythe Michelson and M. Suzanne Mur-

phy, Weinberg, Roger & Rosenfeld, Oakland, California, for the plaintiffs-appellees.

Paul D. Ramshaw, Equal Employment Opportunity Commission, Washington, District of Columbia, amicus curiae.

---

## OPINION

WARDLAW, Circuit Judge, with whom Chief Judge SCHROEDER, Judges REINHARDT, HAWKINS, GRABER, McKEOWN, W. FLETCHER, FISHER, GOULD, PAEZ, BERZON join, and with whom Judge RYMER joins as to Part II-B:

This appeal presents an issue previously decided on virtually identical facts sixteen years ago in *Pallas v. Pacific Bell*, 940 F.2d 1324 (9th Cir. 1991), *cert. denied*, 502 U.S. 1050 (1992). There, we held that Pacific Bell violated Title VII in calculating retirement benefits after the effective date of the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k), when it gave service credit in those calculations for all pre-PDA temporary disability leave taken by employees except leave by reason of pregnancy. *Pallas*, 940 F.2d at 1326-27. Here, a three-judge panel of our court, in a now-withdrawn opinion, held that AT&T Corporation ("AT&T"), successor in interest to Pacific Bell and Pacific Telephone and Telegraph ("PT&T"), *did not* violate Title VII by engaging in identical conduct. The panel reasoned that *Pallas* no longer controlled because it was inconsistent with intervening Supreme Court authority governing retroactivity principles. *Hulteen v. AT&T Corp.*, 441 F.3d 653, 664 (9th Cir. 2006) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)). Because we conclude that *Pallas* is not "clearly irreconcilable" with intervening authority, *see Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc), we affirm the district court's application of *Pallas* to the undisputed facts presented

here and its award of summary judgment against AT&T. We further hold that our conclusion in *Pallas* that calculation of service credit excluding time spent on pregnancy leave violates Title VII was, and is, correct.

**I**

Noreen Hulteen, Eleanora Collet, Linda Porter, Elizabeth Snyder and the Communications Workers of America, AFL-CIO (collectively "Hulteen"), brought this suit to challenge AT&T's use of a facially discriminatory service credit policy to calculate employee pension and retirement benefits. Each of the individual plaintiffs took pregnancy leave between 1968 and 1976. They would have enjoyed more favorable benefits or retirement opportunities had they, at the time that they parted from AT&T, been given full service credit for their pre-PDA pregnancy leaves.

Congress passed the PDA in 1978. Amendments to the Civil Rights Act of 1964, Pub. L. No. 95-555, § 995, 92 Stat. 2076 (1978). The PDA clarified that Title VII prohibits discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions," as discrimination "because of sex." 42 U.S.C. § 2000e(k). The PDA further provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." *Id.* Thus, Title VII, as amended by the PDA, requires employers to accord women who take pregnancy leave the same benefits as employees who take other types of temporary disability leave.

From as early as 1914, AT&T, along with its predecessor companies PT&T and Pacific Bell, has used a Net Credited Service ("NCS") date to calculate employee benefits, including eligibility for early retirement and pension payment

amounts. The NCS date is an employee's original hire date, adjusted forward in time for periods during which no service credit accrued. An earlier NCS date places an employee in a superior position for service-related determinations such as job bidding, vacation time and retirement benefits.

Before August 7, 1977, AT&T and its predecessor companies classified pregnancy leave as personal leave. An employee on personal leave received a maximum of thirty days NCS credit, whereas there was no limit on the amount of NCS credit for employees on temporary disability leave. Also, during that time, some female employees were forced to take pregnancy leave before the onset of pregnancy disability, even though other employees who anticipated a temporary disability could delay their leave until the onset of the disability. Employees on pregnancy leave who subsequently became temporarily disabled for reasons unrelated to pregnancy were ineligible for NCS credit beyond the thirty-day personal leave credit. By contrast, employees on temporary disability leave who suffered a new disability were eligible for NCS credit for the entire leave.

On August 7, 1977, PT&T adopted the Maternity Payment Plan ("MPP"). The MPP extended the maximum pregnancy NCS credit to thirty days before delivery and a maximum of six weeks after delivery. The MPP also allowed pregnant employees to work until the onset of the pregnancy disability. On April 29, 1979, the effective date of the PDA, PT&T adopted the Anticipated Disability Plan ("ADP"). The ADP replaced the MPP and provided service credit for pregnancy leave on the same terms as other temporary disability leave. No service credit adjustments or changes to the NCS date were made for female employees who had taken pregnancy leave under either the MPP or the pre-1977 system. In 1984, ownership of PT&T was transferred to AT&T. The NCS credit calculation method described above remains in force at AT&T, notwithstanding AT&T's operations within the Ninth Circuit and our controlling decision in *Pallas*.

Noreen Hulteen retired involuntarily in 1994 as part of an AT&T reduction in force. She has 210 days of uncredited pregnancy leave that resulted in reduced pension benefits. Eleanora Collet retired voluntarily under an incentive program in 1998 with 261 days of uncredited pregnancy leave. Linda Porter is a current employee with seventy-three uncredited days from pregnancy leave and forced leave before the onset of her pregnancy disability.[1] Elizabeth Snyder terminated her employment voluntarily in 2000, and has sixty-seven days of uncredited pregnancy and unrelated temporary disability occurring during her pregnancy leave. The AT&T plan administrator, in 2000, authorized a credit for Snyder's first thirty days of her 1974 pregnancy leave "as was the policy at the time," changing her NCS date from July 29, 1966 to June 29, 1966.[2]

Between 1994 and 2002, each woman filed a charge with the United States Equal Employment Opportunity Commission ("EEOC"). CWA likewise filed a charge of discrimination with the EEOC on behalf of its bargaining unit

---

[1]We have jurisdiction to entertain Porter's claim even though the illegal employment action — her calculation of benefits — is yet to occur. When a plaintiff seeks declaratory and injunctive relief, as Porter has here, ripeness is evaluated by examining "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *see also* 42 U.S.C. § 2000e-5(g)(1) (If an employer "is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the [employer] from engaging in such unlawful employment practice."). Given AT&T's truculent refusal to credit employees for their pre-PDA pregnancy leave in its benefits calculations as it credits other disability leave (notwithstanding our decision in *Pallas*), Porter faces a real and immediate threat of AT&T making discriminatory employment decisions based on her NCS date.

[2]The remaining appellee, Communications Workers of America ("CWA"), is the collective bargaining representative for the majority of AT&T's non-management employees.

employees. The EEOC issued a Letter of Determination finding reasonable cause to believe that AT&T had discriminated against Noreen Hulteen "and a class of other similarly-situated female employees whose adjusted [NCS] date has been used to determine eligibility for a service or disability pension, the amount of pension benefits, and eligibility for certain other benefits and programs, including early retirement offerings." The EEOC also issued a Notice of Right to Sue to each of the four named plaintiffs and CWA.

Hulteen brought suit, alleging, inter alia, that AT&T violated Title VII in its calculation of NCS credit. On cross-motions for summary judgment, the parties stipulated to all of the material facts. Applying *Pallas*, the district court granted Hulteen's motion for summary judgment on the Title VII claim. AT&T timely appealed, and on March 8, 2006, a panel of our court reversed the district court, holding that *Pallas* gave "the PDA impermissible retroactive effect under controlling law today." *Hulteen*, 441 F.3d at 655. Judge Rymer dissented, arguing that because there appears to be "no acceptable basis . . . to overrule *Pallas*, and AT&T offers no reason for distinguishing it, . . . *Pallas* remains binding and controls disposition of this case." *Id.* at 670. A majority of the active judges of this court voted in favor of rehearing en banc. We consider the appeal anew.

## II

We review de novo the district court's grant of summary judgment. *Qwest Commc'ns, Inc. v. City of Berkeley*, 433 F.3d 1253, 1256 (9th Cir. 2006). "We must determine, viewing the evidence in the light most favorable to [AT&T], the non-moving party, whether . . . the district court correctly applied the substantive law." *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

## A

[1] The district court correctly held that our decision in *Pallas* compels the conclusion that AT&T violated Title VII by

failing to credit pre-PDA pregnancy leave when it calculated benefits owed Hulteen. Lana Pallas was a former Pacific Bell employee who took pregnancy leave before the PDA was enacted. *Pallas*, 940 F.2d at 1325. "In 1987, Pacific Bell instituted a new retirement benefit for management employees called the 'Early Retirement Opportunity.' " *Id.* at 1326. To qualify for the benefit, an eligible employee had to accrue twenty years of service as measured by the same NCS system applied to Hulteen. *Id.* Pallas was denied eligibility because a pregnancy-related leave taken in 1972 deprived her of the necessary amount of service credit by some three or four days. *Id.*

The district court dismissed Pallas's Title VII sex discrimination claim for failure to state a claim, and we reversed. In doing so, we criticized reliance on the Supreme Court's decisions holding that challenges based on disparate impacts resulting from a facially neutral bona fide seniority system must be brought during a limitations period running from the date the system was adopted. *Id.* at 1326-27 (citing *Lorance v. AT&T Techs., Inc.*, 490 U.S. 900, 911 (1989) (holding that "when a seniority system is nondiscriminatory in form and application, it is the allegedly discriminatory *adoption* which triggers the limitations period") (emphasis in original), and *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 557-58 (1977)[3]).

_____

[3]Evans worked as a United Air Lines flight attendant for eighteen months, until she married in 1968 and was forced to resign pursuant to United's policy of prohibiting its female flight attendants from being married. 431 U.S. at 554. While this policy was later found to violate Title VII, Evans was not a party to that suit. *Id.* at 554-55. In 1972, four years after her resignation, United hired Evans as a new employee. *Id.* at 555. Evans was not credited for her previous service pursuant to a new policy prohibiting prior seniority credit from being given to flight attendants, regardless of sex, if they resigned or their employment was "permanently severed for just cause." *Id.* at 555 n.6. Evans filed suit, seeking an award of seniority credit to 1966 and back pay lost because of United's discriminatory no marriage policy. *Id.* at 556 & n.7. The Court found United's

We found *Lorance* and *Evans* inapposite for two reasons. First, because the discriminatory program that gave rise to the lawsuit was instituted in 1987, Pallas's claim "could not have been brought earlier." *Id.*

Second, we concluded that, unlike the facially neutral seniority credit policy in *Evans*,

> the net credit system used to calculate eligibility under the Early Retirement Opportunity is not facially neutral. The system used to determine eligibility facially discriminates against pregnant women. The system distinguishes between similarly situated employees: female employees who took leave prior to 1979 due to a pregnancy-related disability and employees who took leave prior to 1979 for other temporary disabilities.

*Id.* at 1327.[4] We therefore held, relying on *Bazemore v. Friday*, 478 U.S. 385 (1986), that Pacific Bell's decision to discriminate against Pallas in 1987 was actionable because "liability may be imposed" for a pre-Title VII discriminatory policy to the extent it is perpetuated in post-Title VII employment decisions. *Pallas*, 940 F.2d at 1327 (citing *Bazemore*, 478 U.S. at 395 (Brennan, J., joined by all other Members of

---

1972 policy was facially neutral because "both male and female employees who had service prior to February 1968, who resigned or were terminated . . . and who were later re-employed, also were treated as new employees receiving no seniority credit for their prior service." *Id.* at 557. The Court held that the application of the facially neutral policy, which gives present effect to the past discriminatory act of forced resignation for married female flight attendants in 1968, was not actionable. *Id.* at 558.

[4]*Evans* would be controlling if Pacific Bell credited neither pre-PDA pregnancy leave nor pre-PDA disability leave when it made its early retirement determinations in 1987. The dissent, by blurring the distinction between facially neutral and facially discriminatory employment policies, inappropriately relies on *Evans*. *See* Dissent Op. at 10069-70.

the Court, concurring in part) ("Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII.")).

The Court recently reaffirmed *Bazemore* in *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162, 2172-74 (2007).[5] The Court distinguished *Bazemore* on the basis of Ledbetter's failure to show that her disparate treatment was the result of intentional discrimination during the charging period. *Id.* at 2174. The Court reiterated that "a freestanding violation may always be charged within its own charging period regardless of its connection to other violations." *Id.* It explained *Bazemore* as holding:

> when an employer adopts a facially discriminatory pay structure that puts some employees on a lower scale because of race, the employer engages in intentional discrimination whenever it issues a check to one of these disfavored employees. An employer that adopts and intentionally retains such a pay structure can surely be regarded as intending to discriminate on the basis of race as long as the structure is used.

*Id.* at 2173. *Pallas* is true to *Bazemore* and *Ledbetter*: Pacific Bell adopted a policy that calculates pregnancy leave differently than other temporary disability leave, and it engages in intentional discrimination *each time it applies the policy* in a

---

[5]*Ledbetter*, as the Court's most recent pronouncement on Title VII, is relevant, but does not control this appeal. There, the Court considered whether an employee can recover for disparate pay received under a "facially nondiscriminatory and neutrally applied" policy, but which is the result of intentionally discriminatory pay decisions occurring outside the statutory filing period. 127 S. Ct. at 2174 (quoting *Lorance*, 490 U.S. at 911). Here, we are concerned with an employer who made benefits calculations during the statutory filing period and under a seniority system that intentionally discriminates against women affected by pregnancy.

benefits calculation for an employee affected by pregnancy, even if the pregnancy occurred before the enactment of the PDA. 940 F.2d at 1327; *accord Ledbetter*, 127 S. Ct. at 2173; *Bazemore*, 478 U.S. at 395.

**[2]** In *Pallas*, we did not address whether the PDA had retroactive effect because Pallas's complaint alleged that a post-PDA determination — the *calculation* of benefits after the PDA was enacted — discriminated against women on the basis of their pre-PDA pregnancy leaves.

**B**

AT&T admits that under *Pallas* its current conduct in calculating retirement benefits excluding pre-PDA pregnancy leave violates Title VII.[6] AT&T argued to our three-judge panel that *Landgraf* worked a "sea-change" in retroactivity principles. Thus, AT&T continued, *Landgraf* is intervening authority with which the decision in *Pallas* is "clearly irreconcilable," a retroactivity argument the panel majority

---

[6]We reject as disingenuous AT&T's argument that *Pallas* "clearly upset the settled expectations" that it would not be required to credit pre-PDA pregnancy leave in the same manner as temporary disability leave when it made post-PDA retirement and pension decisions. Title VII, enacted in 1964, prohibited employers from discriminating on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). Only one Supreme Court decision cast doubt on whether Title VII prohibited employers from discriminating on the basis of pregnancy: *General Electric Co. v. Gilbert*, 429 U.S. 125, 145-46 (1976) (upholding a policy that denied coverage of pregnancy-related disabilities in its disability benefits plan). "When Congress amended Title VII in 1978, it unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision." *Newport News Shipbldg. & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678 (1983); *see id.* at 679 (Many members of Congress "expressly agreed with the views of the dissenting Justices [in *Gilbert*]."). The PDA therefore did not alter Hulteen's or AT&T's rights or liabilities under Title VII, but corrected *Gilbert*'s erroneous interpretation of Title VII. *Id.* at 678-79 & n.17. Thus, *Pallas*, decided in 1991, could not have upset AT&T's "settled expectations."

embraced. However, as Judge Rymer's dissenting opinion ably points out, AT&T's *Landgraf* argument fails. We adopt Judge Rymer's reasoning:

> [We] read *Landgraf* as refining, rather than sea-changing, the landscape[,] for the Court explicitly drew upon Justice Story's "influential definition" of retroactivity in *Society for Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 766-69 (1814), to make clear how courts should determine whether a statute operates retroactively:
>
>> A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.
>>
>> . . .
>>
>> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would

have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf*, 511 U.S. at 268, 269-70, 280[ ] (internal citations omitted).

[We] do not believe that the reasoning or theory of *Pallas* is so irreconcilable with the reasoning or theory of *Landgraf* as to give [a three-judge] panel license to overrule it. *Pallas* held that the actionable conduct was PT&T's decision to discriminate against the employee on the basis of pregnancy when she applied for, and was denied, early retirement. The decision to deny benefits was made in the post-PDA world. As we emphasized in *United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810 (9th Cir. 1995), if "the law changes the legal consequences of conduct that takes place after the law goes into effect, the law operates on that conduct prospectively." *Id.* at 814. This being the case, and assuming (without deciding) that Congress intended the PDA to have prospective effect only, *Pallas* was premised on a discrete act — the decision to deny a retirement benefit — that gave rise to a current violation of the PDA. Given *Pallas*'s finding of a current violation, the Act operated prospectively on *that* decision.

*Hulteen*, 441 F.3d at 666-67 (Rymer, J., dissenting).

Nor do we agree with AT&T's companion argument that *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996), *rev'g* 60 F.3d

616 (9th Cir. 1995), a post-*Landgraf* decision, demonstrates that *Pallas* gave retroactive effect to the PDA. Again, we adopt Judge Rymer's analysis:

> *Spink* involved 1986 amendments to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §[§] 621, 623(i)(1), and the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1054(b)(1)(i), that prohibited employers from excluding new employees over age 60 from participating in their retirement plans. Spink had worked for Lockheed between 1939 and 1950, and began working there again in 1979 at the age of 61. He was excluded by Lockheed's retirement plan because he was over 60. After the 1986 amendments, Spink was allowed to participate in the plan, but was not credited with accrued benefits based on his years of service with Lockheed prior to the amendments' effective date. Spink sued. We held that denying credited service years that an older employee would otherwise have accumulated was unlawful under the amendments. In so doing, we observed that, "[t]o the extent our interpretation requires employers to include pre-enactment service years in calculating accrued benefits, it applies retroactively." 60 F.3d at 620, n.1. AT&T seizes upon this remark to maintain that when the Supreme Court reversed our conclusion that Congress intended the statute to have retroactive effect, it necessarily agreed that requiring employers to include pre-enactment service in calculating accrued benefits was a retroactive application. [We] cannot read so much into the *Spink* opinions. Our observation in *Spink I* did not affect our ultimate decision in that case because the decision was "based on the retroactive intent of the statute manifested in its text." *Id.* The Supreme Court simply disagreed with our construction of the statute. Thus, its analy-

sis — like ours — was limited to *Landgraf*'s first step.

*Hulteen*, 441 F.3d at 667-68 (Rymer, J., dissenting).

[3] Thus, *Landgraf* and *Spink* do not implicate, much less contradict, the twin holdings of *Pallas* that the NCS system is facially discriminatory and that the post-PDA decision as to Pallas's eligibility is the relevant, actionable discriminatory employment practice.

AT&T also asserts incorrectly that *Pallas* must be overruled because it relied upon the "continuing violation" doctrine abrogated in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 (2002) (holding an employee can only recover for discrete discriminatory acts that occur within the statutory filing period). As Judge Rymer explained:

> Neither the reasoning nor theory of *Morgan* is irreconcilable with *Pallas*. *Pallas* held that the NCS system is facially discriminatory, an issue that was not presented in *Morgan*. Morgan sought damages, which Pallas did not. Further, Morgan proceeded on the basis of a continuing violation, whereas Pallas relied upon PT&T's decision to deny benefits as the discrete act that was actionable. As the *Pallas* court saw it, this was a current violation, not a continuing one.

*Hulteen*, 441 F.3d at 668 (Rymer, J., dissenting). *Morgan* is also inapposite because, as in *Pallas*, it is undisputed here that the charges were filed with the EEOC within the statutory filing period after the denial of retirement benefits.

Moreover, our decision in *Pallas* is consistent with *Morgan*'s holding that "[t]he existence of past acts . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and

charges addressing those acts are themselves timely filed." *Morgan*, 536 U.S. at 113. In *Morgan*, the Court listed "termination, failure to promote, denial of transfer, or refusal to hire" as examples of employment decisions that are discrete acts, and explained that each one, if decided in a discriminatory fashion, "constitutes a separate actionable 'unlawful employment practice.' " *Id.* at 114; *see also Ledbetter*, 127 S. Ct. at 2169 (explaining "if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed"). While Pacific Bell may have used unlawful calculations in many prior employment decisions, its denial of early retirement was a discrete independent act. *See Pallas*, 940 F.2d at 1327. Because Pallas timely filed a charge, the existence of past acts would not bar her (or here, Hulteen's) suit under *Morgan* or *Ledbetter*.

**[4]** A three-judge panel must follow a prior circuit decision unless a subsequent decision by a relevant court of last resort either effectively overrules the decision in a case "closely on point" or undercuts the reasoning underlying the circuit precedent rendering the cases "clearly irreconcilable." *Miller*, 335 F.3d at 899-900. Because *Pallas* is not irreconcilable with *Landgraf*, *Spink* or *Morgan*, it is well-settled law that the panel was required to either follow *Pallas* or make a sua sponte en banc call. *See, e.g.*, *In re Complaint of Ross Island Sand & Gravel v. Matson*, 226 F.3d 1015, 1018 (9th Cir. 2000) (per curiam) ("[A]bsent a rehearing en banc, we are without authority to overrule [controlling circuit precedent].").

**[5]** "[T]he important doctrine of *stare decisi*s . . . permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact." *Vasquez v. Hillery*, 474 U.S. 254, 265-66 (1986). "[T]he labor of judges would be increased almost to the breaking point if every past

decision could be reopened in every case." BENJAMIN N. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 149 (Yale Univ. Press 1960). The danger we create when we depart lightly from our precedent is underscored by AT&T's admission here, that even sixteen years after *Pallas* was decided, it continues to operate its NCS system in a discriminatory fashion because of "its belief that the PDA does not apply retroactively" and "in order to preserve its ability to litigate the issue in its own right." AT&T's litigation position rests on the assumption that our precedent can be ignored. Because it cannot, we affirm the district court's summary judgment in favor of Hulteen.[7]

### III

**[6]** A plain reading of Title VII supports the legal conclusion reached in *Pallas*. By passing the PDA, Congress clarified that discrimination "because of sex" under Title VII included discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). It further added the requirement that employers treat "women affected by pregnancy . . . the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." *Id.*

---

[7]AT&T also argues that *Pallas* should not be followed because it failed to cite and follow the purportedly controlling decision in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977) ("*IBT*"). AT&T argues that *IBT* forecloses Pallas's claim because the Court construed 42 U.S.C. § 2000e-2(h) as immunizing neutral seniority systems from challenge. *Id.* at 352-53. We disagree. In *Pallas*, we cited *Lorance* which not only cited *IBT*, but also distinguished facially neutral from facially discriminatory seniority systems. *Lorance*, 490 U.S. at 905, 909, 911-12. *Pallas* found the NCS system facially discriminatory because it treated similarly situated employees differently if the female employee took a pre-PDA pregnancy-related disability leave. *Pallas*, 940 F.2d at 1327.

In interpreting this additional requirement, we must begin with the text of the statute. Where congressional intent "has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570 (1982) (internal quotation omitted). And when "the meaning of the words seems to us to be intelligible upon a simple reading, . . . we shall spend no time upon generalities concerning the principles of [statutory] interpretation." *United States v. M.H. Pulaski Co.*, 243 U.S. 97, 106 (1917).

**[7]** The ordinary meaning of "affected" is "[a]cted upon, influenced, or changed." *The American Heritage Dictionary of the English Language* 28 (4th ed. 2000); *see also Black's Law Dictionary* 62 (8th ed. 2004) (defining "affect" as "[m]ost generally, to produce an effect on; to influence in some way"). Applying the ordinary meaning of the term "affected" here leads to the conclusion that although Hulteen was affected by pregnancy when she took pregnancy leave, she was again "affected by pregnancy" when AT&T calculated her retirement benefits in 1994, deliberately choosing to use an NCS date that would deprive her of benefits received by those who were not "affected by pregnancy" by excluding her earlier pregnancy leave from the later calculation of benefits. It was well within AT&T's ability and control to calculate Hulteen's benefits in 1994 giving her service credit for the time she spent on pregnancy leave, and to thus avoid violating the PDA. AT&T simply chose to continue its systematic discrimination against women, based on pregnancy, even after Congress made it illegal.

**[8]** In 1991, Congress amended the Civil Rights Act to make it clear, if *Pallas* had not already done so, that an employer who adopts a seniority system for an intentionally discriminatory purpose commits an unlawful employment practice "when the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority

system or provision of the system." Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, 1078-79 (Nov. 21, 1991). Congress thus clarified that injury occurs at the time that the seniority system is applied to the aggrieved party because that is when the employee is actually harmed by the deprivation of benefits. *See* 42 U.S.C. § 2000e-5(e)(2). As the House Report accompanying the amendment noted, this amendment was intended to "overrule[ ] *Lorance* and per-mit[ ] person[s] to challenge discriminatory employment prac-tices when those practices actually harm them." H.R. REP. NO. 102-40, pt. II, at 3 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 695. Congress was concerned that, "[t]aken to its logical conclusion, the *Lorance* rule would bar all challenges to pres-ent day applications of discriminatory practices in existence when Title VII became law since, under the *Lorance* rule, the deadline for a timely charge would have expired before Title VII became effective." *Id.* at 23, *reprinted in* 1991 U.S.C.C.A.N. 694, 716. The Supreme Court recently acknowledged that this amendment was targeted at *Lorance* and designed to "allow[ ] Title VII liability [to arise] from an intentionally discriminatory seniority system both at the time of its adoption and at the time of its application." *Ledbetter*, 127 S. Ct. at 2169 n.2.

**[9]** AT&T applied its discriminatory seniority system to Hulteen in 1994, causing her to be deprived of early retire-ment benefits and thus injuring her. AT&T never asserted that it could not credit Hulteen with pregnancy leave when it denied and/or calculated her benefits. Indeed, AT&T and Hulteen stipulated not only to the number of days each plain-tiff was penalized within the charging period for past preg-nancies but also to AT&T's ability to add service credit to an employee's length of service. Instead of engaging in its dis-criminatory calculation and defending the EEOC charge and this litigation, AT&T could have simply credited the applica-ble number of days to each plaintiff's NCS date when it cal-culated her benefits.

AT&T, in fact, credited plaintiff Elizabeth Snyder thirty days from her 1974 pregnancy leave in 2000. In a March 1, 2000 letter, Pension Plan Administrator Michael L. Brown stated:

> In preparing your claim for service credit for the period of your maternity leave of absence for review by the Employees' Benefit Committee, it was determined that you were not given service credit for the first 30 calendar days of your leave (as was the policy at the time).
>
> Therefore, I have authorized the Pension Service Center to adjust your Net Credited Service date by 30 days.

The Pension Service Center, on March 29, 2000, notified Snyder that "[a]fter a careful review of [her] service record history," her NCS date had been adjusted from July 29, 1966 to June 29, 1966. These letters demonstrate that in its determination of benefits, AT&T does not simply rely on pre-PDA NCS calculations. Rather, when AT&T determines benefits eligibility, it reviews an employee's entire work history and affirmatively chooses to apply "the policy at the time" that the leave occurred. Any assertion that the violations here are continuing effects of pre-PDA discrimination and thus "unfortunate event[s] in history which [have] no present legal consequences" is belied by this record. *Ledbetter*, 127 S. Ct. at 2168 (quoting *Evans*, 431 U.S. at 558). That AT&T's practice of applying the discriminatory pre-PDA policies constitutes a separate and actionable act of discrimination is "too obvious to warrant extended discussion." *Ledbetter*, 127 S. Ct. at 2173 (quoting *Bazemore*, 478 U.S. at 395).

AT&T asks us, sitting en banc, to overrule *Pallas* and follow the Seventh Circuit's approach in *Ameritech Benefit Plan Committee v. Communication Workers of America*, 220 F.3d

814 (7th Cir. 2000).[8] We decline to do so. The Seventh Circuit's analysis in *Ameritech* is problematic because, although it mentioned the Civil Rights Act of 1991, it failed to actually apply it.

In *Ameritech*, the Seventh Circuit considered a claim nearly identical to Pallas's and Hulteen's made by two women who filed a charge with the EEOC when, due to an NCS system that, like Pacific Bell's and AT&T's here, failed to credit time spent on pregnancy leave, they were denied early retirement benefits in 1994. *Id.* at 817-18. The Seventh Circuit found that Ameritech's NCS system was a seniority system because it calculated "relative lengths of employment." *Id.* at 823 (citing *Cal. Brewers Ass'n v. Bryant*, 444 U.S. 598, 606 (1980)). It next incorrectly concluded that the time of injury provisions of § 2000e-5(e)(2) were inapplicable because the plaintiffs failed to "show the kind of intentional discrimination that would trigger [this] exception to the statutory protection afforded to [bona fide] seniority systems [under 42 U.S.C. § 2000e-2(h)]." *Id.* However, as we explained in *Pallas*, the NCS system "facially discriminates against pregnant women [because it] distinguishes between similarly situated employees." 940 F.2d at 1327. Facial discrimination is "by its very terms" intentional discrimination. *Lovell v. Chandler*, 303 F.3d 1039, 1057 (9th Cir. 2002); *see also UAW v. Johnson*

---

[8]In *Ameritech*, decided nine years after *Pallas*, the Seventh Circuit created an inter-circuit conflict over this issue without citing *Pallas*. Since then, the Eighth Circuit has rejected an analysis similar to that found in *Ameritech*. *Cf. Maki v. Allete, Inc.*, 383 F.3d 740, 742-45 (8th Cir. 2004) (holding that pension benefits calculated post-PDA using past discriminatory marriage and pregnancy policies violated Title VII, rejecting arguments that application of the PDA was impermissibly retroactive and time-barred because the discriminatory act occurred when the "pension benefits vested" and the "discriminatory provision . . . was applied to each plaintiff"). In *Maki*, as in *Pallas* and here, the policy at issue was facially discriminatory. The dissent would have us disregard a well-reasoned decision by the Eighth Circuit in favor of the Seventh Circuit's *Ameritech* decision, which erroneously failed to apply the very legislation it purported to interpret. *See* Dissent Op. at 10059 n.7.

*Controls, Inc.*, 499 U.S. 187, 199 (1991) (holding "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect"). The Seventh Circuit should have applied § 2000e-5(e)(2) to the *Ameritech* facts, which would have led it to the ineluctable conclusion that Ameritech had committed an unfair employment practice in 1994 when it denied early retirement benefits.

**[10]** The Seventh Circuit compounded its error by also concluding that the system was immunized from challenge as an unlawful employment practice by 42 U.S.C. § 2000e-2(h), because a seniority system that perpetuates pre-PDA discrimination can nevertheless be a bona fide system, *id.* at 823 (citing *IBT*, 431 U.S. at 352-53), and thus nonactionable under § 2000e-2(h) of Title VII.

Section 2000e-2(h) provides:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . . It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.

42 U.S.C. § 2000e-2(h).[9] Under this section, unintentional dis-

---

[9]The statutory language, "[i]t shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the

criminatory effects resulting from bona fide seniority systems are exempted from Title VII's definition of an unlawful employment practice. What the Seventh Circuit failed to note in *Ameritech* is that the PDA, which was subsequently enacted to prohibit sex discrimination based on pregnancy, also expressly provides that "nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise." 42 U.S.C. § 2000e(k). Thus, the *Ameritech* decision runs contrary to this express legislative directive.

Neither the Supreme Court nor we have analyzed the interaction of these two Title VII provisions.[10] By beginning § 2000e-2(h) with the phrase "[n]otwithstanding any other provision of this subchapter," Congress broadly exempted bona fide seniority systems from Title VII's coverage. However, in enacting the PDA in 1978, Congress could not have been more clear in expressing its intent to limit the scope of the bona fide seniority system exemption, when it stated that "nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise." 42 U.S.C. § 2000e(k). A later-enacted specific amendment, like the PDA, alters an earlier broad provision of the statute when the amendment states that it should control. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.

basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29," is also known as the "Bennett Amendment."

[10]Section 2000e(k) post-dates *Evans* and *IBT*. Nor was it construed in any of the Supreme Court decisions concerning timeliness under Title VII. *See Ledbetter*, 127 S. Ct. at 2165-66 (sex-based salary discrimination); *Morgan*, 536 U.S. at 104 (race discrimination); *Lorance*, 490 U.S. at 901-05 (seniority policy that had a disparate impact on women unrelated to pregnancy); *Bazemore*, 478 U.S. at 387 (race-based salary discrimination).

This is particularly so where the scope of the earlier statute is broad but the subsequent statute[ ] more specifically address-[es] the topic at hand.") (internal citation and quotations omitted); *cf. Morton v. Mancari*, 417 U.S. 535, 545-50 (1974) (refusing to find an implied repeal of part of Title VII "in the absence of some affirmative showing of an intention to repeal"). We agree with the dissent that Congress knows how to specifically carve out exceptions in Title VII. *See* Dissent Op. at 10075-76. If Congress merely wanted to prevent the Bennett Amendment from being used to justify pregnancy-based discrimination, it could have tailored § 2000e(k)'s exception to cover only the Bennett Amendment instead of broadly excepting all of § 2000e-2(h).

**[11]** Further, although Congress did not amend the text of § 2000e-2(h) in its 1978 amendments, it unequivocally expressed a policy that the bona fide seniority system exemption will not immunize employers from liability for seniority systems that discriminate based on pregnancy. " '[A] specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it has not been expressly amended.' " *Brown & Williamson Tobacco Corp.*, 529 U.S. at 143 (second alteration in original) (quoting *United States v. Estate of Romani*, 523 U.S. 517, 530-31 (1998)). The express text of, as well as the policy embodied in, the PDA thus preclude the application of § 2000e-2(h) in pregnancy discrimination suits under Title VII. Any argument predicated upon a supposed contrary legislative intent argument is thus irrelevant to the proper analysis. "[I]t is well-settled that 'reference to legislative history is inappropriate when the text of the statute is unambiguous.' " *United States v. Sioux*, 362 F.3d 1241, 1246 (9th Cir. 2004) (quoting *HUD v. Rucker*, 535 U.S. 125, 132 (2002)).

**[12]** Therefore, the Seventh Circuit in *Ameritech* misconstrued the PDA when it held that § 2000e-2(h) shielded Ameritech from liability for its facially discriminatory prac-

tices.[11] We will not follow a decision that ignores a central provision of the PDA while purporting to apply it.

## IV

[13] The district court properly applied our decision in *Pallas* to conclude that AT&T's post-PDA benefits calculations violated the PDA. *Pallas* was, and remains, good law. We therefore affirm the district court's summary judgment in favor of Hulteen, Collet, Porter, Snyder and CWA on their Title VII sex discrimination claims.

---

[11]The Sixth Circuit recently adopted part of *Ameritech*'s analysis in *Leffman v. Sprint Corp.*, 481 F.3d 428 (6th Cir. 2007). Leffman was found ineligible for Special Early Retirement benefits in 2000 because of an uncredited pregnancy leave taken in 1976. *Id.* at 429. The court affirmed the district court's grant of summary judgment in favor of Sprint, relying on *Evans*, *id.* at 431-32, and *Ameritech*, *id.* at 433. The court failed to discuss the 1991 Civil Rights Amendments, however, and concluded that Leffman's claim was time-barred. *Id.* at 433 (citing *Sawchik v. E.I. DuPont Denemours & Co.*, 783 F.2d 635, 638 (6th Cir. 1986)). The court made the same error as the Seventh Circuit in *Ameritech*, relying on § 2000e-2(h) without acknowledging that the PDA had carved out pregnancy discrimination from that exemption. *Id.* at 430-31. Finally, the court inexplicably justified its decision with the flawed conclusion that Sprint did not discriminate at all because it treated non-credited maternity leave like other non-credited leave. *Id.* at 433. This comparison was inapt because, in 1976, Sprint employees received credit for time spent on sick or disability leave for reasons other than pregnancy. The *Leffman* court missed the point that if Leffman had been allowed to take sick or disability leave for her 1976 pregnancy disability, she would have qualified for early retirement benefits in 2000 like other employees who received credited leave time when they were similarly unable to work for reasons other than pregnancy. *See Leffman v. Sprint Corp.*, No. 3:04CV7222, 2006 WL 144549, at *1-2 (N.D. Ohio Jan. 18, 2006). The dissent employs similarly faulty logic to conclude Hulteen cannot show intentional discrimination because AT&T's benefits calculation was made pursuant to her NCS date. *See* Dissent Op. at 10069. Like Leffman's, Hulteen's benefits would have been greater if AT&T had chosen when it calculated her retirement benefits post-PDA to treat her pre-PDA pregnancy leave the same as pre-PDA disability unrelated to pregnancy leave.

**AFFIRMED.**

---

O'SCANNLAIN, Circuit Judge, with whom Judges RYMER, BYBEE, and CALLAHAN join, dissenting:

By concluding that *Pallas v. Pacific Bell*, 940 F.2d 1324 (9th Cir. 1991), *cert. denied*, 502 U.S. 1050 (1992), remains good law, the majority erroneously perpetuates a circuit split with the Sixth and the Seventh Circuits.[1] I believe that *Pallas* was wrong then and is wrong now. Because this en banc court can and should overrule *Pallas* and follow the Seventh Circuit's well-reasoned decision in *Ameritech Benefit Plan Committee v. Communication Workers of America*, 220 F.3d 814 (7th Cir.), *cert. denied*, 531 U.S. 1127 (2000), I must respectfully dissent from the majority's conclusion that the sex discrimination claims in this case are timely.[2]

---

[1]*Compare Pallas*, 940 F.2d at 1327, *with Ameritech Benefit Plan Comm. v. Commc'n Workers of Am.*, 220 F.3d 814 (7th Cir. 2000), *and Leffman v. Sprint Corp.*, 481 F.3d 428, 433 (6th Cir. 2007). No circuit has followed our decision in *Pallas*.

[2]The majority devotes considerable attention to whether intervening Supreme Court authority is "clearly irreconcilable" with our prior decision in *Pallas*. *Ante*, at 10037-43. That standard governs whether a three-judge panel of our court is free to reexamine the holding of prior circuit precedent. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Here, of course, we sit as an en banc court. If *Pallas* is wrongly decided, we are free to overrule it even if subsequent authorities are not "clearly irreconcilable." *See id.* at 902 (O'Scannlain, J., concurring in part) ("The en banc court, however, is unencumbered by any obligation to follow the decision of a three-judge panel, and therefore is free to do what . . . [a] panel could not."); *see also Robbins v. Carey*, 481 F.3d 1143, 1149 n.3 (9th Cir. 2007) ("Ordinarily, panels cannot overrule a circuit precedent; that power is reserved to the circuit court sitting en banc."). I turn directly to that inquiry.

## I

At the core of this dispute is AT&T Corporation's ("AT&T")[3] Net Credit Service ("NCS") seniority system, a concept which is not defined in Title VII. *See Cal. Brewers Ass'n v. Bryant*, 444 U.S. 598, 605 (1980). The term "seniority" connotes length of employment. *Id.* "A 'seniority system' is a scheme that, alone or in tandem with non-'seniority' criteria, allots to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase." *Id.* at 605-06 (footnotes omitted). "[T]he principal feature of any and every 'seniority system' is that preferential treatment is dispensed on the basis of some measure of time served in employment." *Id.* at 606. "In order for any seniority system to operate at all, it has to contain ancillary rules that accomplish certain necessary functions." *Id.* at 607. "[E]very seniority system must include ancillary rules that delineate how and when the seniority time clock begins ticking," as well as other provisions that "define which passage of time will 'count' towards the accrual of seniority and which will not." *Id.*

AT&T has such a seniority system. Pursuant to that system, AT&T maintains an NCS date for each employee (from the initial date of hire until the date of termination) that consists of that employee's original hire date and any adjustments for periods during which no service credit is accrued pursuant to ancillary rules. AT&T moves the NCS date forward to "squeeze out" the periods of leave or breaks in service that are not credited, resulting in a later NCS date. AT&T uses the NCS date that it maintains for each employee for purposes of determining retirement benefits and other employment benefits. An earlier NCS date places an employee in a compara-

---

[3]For sake of convenience, I refer throughout this dissent to the employer as AT&T, even though AT&T was a successor in interest to Pacific Telephone and Telegraph ("PT&T") after the former Bell system was broken up in 1984. The difference in corporate identity does not affect the outcome of this case.

tively better position for employment-related determinations, including job bidding, layoffs, and eligibility for and calculation of certain retirement benefits.

Prior to August 7, 1977, AT&T's seniority system included two ancillary rules important to this case. The first provided that an employee received only 30 days of NCS credit for personal leave, but received full credit for temporary disability leave. The second specified that pregnancy leave would be treated as personal leave. AT&T applied these two rules to calculate NCS dates for all employees who became pregnant prior to that date. At no time did AT&T apply the pregnancy leave rule to any employee who became pregnant on or after August 7, 1977. With one exception,[4] the record fails to establish that on or after August 7, 1977, AT&T applied the pregnancy leave rule in effect before that date to adjust or to recalculate any employee's NCS date.

On August 7, 1977, AT&T adopted the Maternity Payment Plan ("MPP"), which supplanted the prior pregnancy leave rule. According to the MPP's new rule, up to six months of pregnancy leave would be treated as disability leave with full NCS credit, and any pregnancy leave in excess of six months would be treated as personal leave with a maximum of 30 days of NCS credit. Employees on non-pregnancy related disability leave continued to receive full NCS credit. AT&T applied the MPP pregnancy leave rule to adjust the NCS dates for all employees who became pregnant before April 29, 1979; AT&T did not retroactively apply the MPP pregnancy leave rule to adjust the NCS dates for any employees who became pregnant before August 7, 1977. The record fails to demonstrate that AT&T applied the MPP pregnancy leave rule to adjust or to recalculate any employee's NCS date on or after April 29, 1979.

---

[4]In 2000, AT&T credited Elizabeth Snyder's NCS seniority with 30 days because the previous NCS date mistakenly had not been adjusted earlier for her pregnancy leave in 1974. *See infra* pp. 10067-68.

In response to the Pregnancy Discrimination Act of 1978 ("PDA"), Pub. L. No. 95-555, 92 Stat. 2076, on April 29, 1979 (the effective date of the PDA), AT&T adopted the Anticipated Disability Plan ("ADP"), which superseded the MPP pregnancy leave rule. The ADP provided that pregnancy leave would be treated as disability leave with full NCS credit for the entire period of pregnancy. The ADP pregnancy leave rule remains in effect in AT&T's current NCS seniority system. AT&T applies the new ADP pregnancy leave rule to adjust the NCS dates for all employees who become pregnant on or after April 29, 1979. AT&T, however, made no adjustment to the NCS dates for employees who had been subject to the MPP pregnancy leave rule or the pre-1977 pregnancy leave rule. Thus, for example, an employee who took pregnancy leave in 1980, after the effective date of the PDA, would receive full NCS seniority credit for that period of leave, but no adjustments were made to the NCS date of an employee who took pregnancy leave in 1976 and received a maximum of 30 days NCS seniority credit, or who took pregnancy leave in 1977 and received a maximum of six months and 30 days of credit.

Noreen Hulteen, Eleanora Collect, Linda Porter, and Elizabeth Snyder are all female employees of AT&T who took pregnancy leaves between 1968 and 1976, before the enactment of the PDA.[5] Under AT&T's NCS seniority system in effect at that time, Hulteen, Collect, Porter, and Snyder received only partial NCS credit for their pregnancy leaves, resulting in a later NCS date. AT&T's subsequent calculation of their benefits or the dates of their retirement eligibility between 1994 and 2000, would have been more favorable had AT&T retroactively credited their NCS dates for the previously uncredited periods of pregnancy leave before the enact-

---

[5]For the sake of convenience, I will focus specifically on Hulteen's sex discrimination claim throughout the dissent. Except where expressly noted, the reasoning with respect to that claim applies equally to the other employees' claims.

ment of the PDA. They contend that AT&T discriminated on the basis of sex in violation of Title VII when AT&T determined their benefits based on the NCS dates that were unadjusted to account for uncredited pre-PDA pregnancy leave.

II

A

Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, makes it an "unlawful employment practice" for any employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

In *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), the Supreme Court held that discrimination based on pregnancy was not discrimination within the meaning of Title VII. *Id.* at 145-46. There, General Electric adopted an employee disability benefit plan that paid weekly nonoccupational sickness and accident benefits. *Id.* at 127. However, General Electric excluded from that plan's coverage disabilities arising from pregnancy. *Id.* The specific issue before the Court was whether Title VII prohibited excluding pregnancy-related disabilities from an employer's disability benefit plan. The Supreme Court recognized that pregnancy is confined to women, but reasoned that the disability benefit plan did not discriminate in violation of Title VII by excluding pregnancy-related disabilities from its coverage:

> The Plan, in effect (and for all that appears), is nothing more than an insurance package, which covers some risks but excludes others. The "package" going to relevant identifiable groups we are presently concerned with—General Electric's male and female employees—covers exactly the same categories of risk, and is facially nondiscriminatory in the sense

that "there is no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." As there is no proof that the package is in fact worth more to men than to women, it is impossible to find any gender-based discriminatory effect in this scheme simply because women disabled as a result of pregnancy do not receive benefits; that is to say, gender-based discrimination does not result simply because an employer's disability-benefits plan is less than all-inclusive.

*Id.* at 138-39 (internal citations and footnote omitted).

In 1978, in response to *Gilbert*, Congress passed the Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, 92 Stat. 2076, which became effective on April 29, 1979,[6] and amended Title VII to define "because of sex" or "on the basis of sex" to include discrimination based on pregnancy. 42 U.S.C. § 2000e(k). The PDA states in relevant part:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise. . . .

---

[6]"The amendment to Title VII became effective on the date of its enactment, October 31, 1978, but its requirements did not apply to any then-existing fringe benefit program until 180 days after enactment—April 29, 1979." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 671 n.2 (1983).

*Id.*

An individual must file charges of discrimination under Title VII within 180 days "after the alleged unlawful employment practice occurred," unless the employee has first instituted proceedings with a state or local agency, in which case the period is extended to 300 days. 42 U.S.C. § 2000e-5(e)(1). The dispositive issue in this case is whether Hulteen timely filed a sex discrimination action within the specified period of limitations.

As the Supreme Court has repeatedly stressed, we must "identify with care the specific employment practice that is at issue" when determining whether the sex-discrimination action is timely. *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162, 2167 (2007) (citing *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 110-11 (2002)); *see also Delaware State College v. Ricks*, 449 U.S. 250, 257 (1980). There are three possible candidates in this case: (1) AT&T's *adoption* of its pregnancy leave rules before the enactment of the PDA; (2) AT&T's *application* of those leave rules to adjust Hulteen's NCS date before the enactment of the PDA; and (3) AT&T's *calculation* of Hulteen's retirement benefits in 1994 based, in part, on the NCS date it consistently maintained for her without retroactively adjusting that date for pre-PDA pregnancy leave. The time to challenge the first and second possible employment practices, however, has long since expired. Accordingly, relying on our prior decision in *Pallas*, Hulteen points us to the third alternative employment practice in 1994 when AT&T declined to grant retroactive NCS credit for pre-PDA pregnancy leave before it calculated her retirement benefits.

Accepting Hulteen's argument that such calculation in 1994 constituted a new and current violation of Title VII, the majority holds that her Title VII action is timely. In so concluding, the majority perpetuates *Pallas*'s error by breathing new life into an expired sex discrimination claim. On virtually

identical facts, the Seventh Circuit reached the opposite conclusion in *Ameritech*.[7] Because I believe the Seventh Circuit's decision faithfully applies controlling Supreme Court precedents and the relevant provisions of Title VII, I would follow that court's reasoning.

### III

"The outcome of this case," as the Seventh Circuit recognized, "turns on which of two competing lines of authority provide a better 'fit' here." *Ameritech*, 220 F.3d at 822. The Seventh Circuit followed *United Air Lines v. Evans*, 431 U.S. 553 (1977), and its progeny. In *Pallas*, on the other hand, this court followed *Bazemore v. Friday*, 478 U.S. 385 (1986) (per curiam). Because the majority follows *Pallas* today, the *Bazemore* and *Evans* line of cases deserve careful attention.

### A

In *Bazemore*, the North Carolina Agricultural Extension Service ("Service") maintained two separate, racially segregated work forces and paid black employees less than white employees prior to the enactment of Title VII. 478 U.S. at 390-91 (Brennan, J., joined by all other Members of the Court, concurring in part). After the enactment of Title VII, the Service integrated the workforce, but the pay disparity between black employees and white employees in the same positions remained. *Id.* The Supreme Court held that the Service was not liable for the discriminatory acts that occurred prior to the enactment of Title VII and therefore "recovery may not be permitted for [pre-Title VII] acts of discrimina-

---

[7]The majority contends that in *Maki v. Allette, Inc.*, 383 F.3d 740 (8th Cir. 2004), the Eighth Circuit rejected an analysis similar to that found in *Ameritech*. *Ante*, at 10047 n.8. But that case is quite different from *Ameritech* and the one before us today. Unlike in *Maki*, Hulteen has not established that, after the enactment of the PDA, AT&T adopted a new seniority rule to bridge prior periods of employment for an intentionally discriminatory purpose.

tion." *Id.* at 395. However, the Supreme Court concluded that the pay disparity that remained after the enactment of Title VII was unlawful because "[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII." *Id.* at 395-96.

B

1

The Supreme Court's decision in *Evans* represents the fountainhead for the competing line of authority. In *Evans*, United Air Lines ("United") maintained a policy of refusing to allow its female flight attendants to be married. 431 U.S. at 554. Evans married in 1968 and therefore was forced to resign pursuant to United's no-marriage policy. *Id.* Previously, the Seventh Circuit held that United's policy violated Title VII. *Sprogis v. United Air Lines*, 444 F.2d 1194 (7th Cir.), *cert. denied*, 404 U.S. 991 (1971). Evans, however, was not a party to *Sprogis* and failed to initiate any proceedings against United within the period of limitation for that past act of discrimination. *Evans*, 431 U.S. at 555. After United ended the no-marriage policy, United rehired Evans in 1972 as a new employee, but refused to give her seniority credit for any prior service with United. *Id.* Evans conceded that it was too late to bring an action for her forced termination, but asserted that "United [was] guilty of a present, continuing violation of Title VII and therefore that her claim is timely." *Id.* at 557.

Evans argued that "the seniority system gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination." *Id.* at 557. Rejecting that argument, the Court emphasized that "United's seniority system *does* indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present

*violation* exists." *Id.* at 558 (first emphasis added). Concluding that none did, the Court explained that "[a] discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. . . . . [I]t is merely an unfortunate event in history which has no present legal consequences." *Id.* at 558.

2

The Supreme Court again embraced *Evans*'s reasoning in *Delaware State College v. Ricks*, 449 U.S. 250. In that case, Delaware State College denied Ricks, an African American librarian, academic tenure in March 1974. *Id.* at 252. Adhering to its policy of not discharging immediately a junior faculty member who did not receive tenure, the College offered Ricks a nonrenewable one-year "terminal" contract that would expire on June 30, 1975, with explicit notice that his employment would end on that date. *Id.* at 253. Ricks filed an employment discrimination charge against the College in April 1975, alleging, *inter alia*, that the College unlawfully discriminated against him on the basis of race in violation of Title VII. *Id.* at 255.

Ricks argued that the period of limitations ran from the date that his one-year terminal contract expired rather than the date when the College denied tenure. *Id* at 257. Rejecting Ricks's argument, the Supreme Court held that his claim for discrimination in violation of Title VII was untimely. *Id*. at 256. The Court concluded that "the only alleged discrimination occurred—and the filing limitations period therefore commenced—at the time the tenure decision was made and communicated to Ricks . . . . even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later."**[8]** *Id.* at 258. The Supreme

---

**[8]**I note that, according to the parties' joint stipulation of facts, Hulteen (as well as the other plaintiffs) knew that AT&T granted only partial NCS

Court emphasized that "[i]t is simply insufficient for Ricks to allege that his termination 'gives present effect to the past act and therefore perpetuates the consequences of forbidden discrimination.' " *Id.* (quoting *Evans*, 431 U.S. at 557).

3

The Supreme Court's recent decision in *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162, confirms this understanding of the *Evans* line of authority. Ledbetter worked for Goodyear Tire and Rubber Company ("Goodyear") from 1979 until 1998. *Id.* at 2165. Goodyear maintained a policy during that time of granting or denying raises for salaried employees based on their supervisors' evaluations of their performance. *Id.* In 1998 Ledbetter brought an action against Goodyear, asserting, among other claims, a Title VII pay discrimination claim. *Id.* At trial, she "introduced evidence that during the course of her employment several supervisors had given her poor evaluations because of her sex, that as a result of these evaluations her pay was not increased as much as it would have been if she had been evaluated fairly, and that these past pay decisions continued to affect the amount of her pay throughout her employment." *Id.* at 2165-66. The evidence also established that Ledbetter was earning significantly less than her male counterparts at the end of her career. *Id.* at 2166.

Ledbetter argued that her action was timely, pointing to two different employment practices during the applicable period of limitation as possible candidates. *Id.* at 2167. First, she argued that each paycheck issued during the period of limitations was a separate act of discrimination. *Id.* Alternatively,

---

credit at the time of her pre-PDA pregnancy leave, was aware that her unadjusted NCS seniority dated traveled with her from PT&T to AT&T in 1984, and periodically received documents throughout her employment containing the unadjusted NCS seniority date. *See also Ledbetter*, 127 S. Ct. at 2177 & n.10.

she argued that the 1998 decision denying her a raise "was 'unlawful because it carried forward intentionally discriminatory disparities from prior years.' " *Id.* "In essence, she suggests that it is sufficient that discriminatory acts that occurred prior to the charging period had continuing effects during that period." *Id.* The Supreme Court rejected Ledbetter's first argument because she failed to allege actual discriminatory intent by the relevant Goodyear decisionmakers when they issued her checks or denied her a raise in 1998. *Id.* Furthermore, the Court rejected Ledbetter's alternative argument, concluding that it was squarely foreclosed by the *Evans* line of authority. *Id.* The Court emphasized that the instruction from that line of authority is clear: "The EEOC charging period is triggered when a discrete unlawful practice takes place. A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent non-discriminatory acts that entail adverse effects resulting from the past discrimination." *Id.* at 2169. The Court specifically rejected as unsound Ledbetter's attempt to shift the intent from the prior discriminatory employment practice to the 1998 pay decision denying her raise. *Id.* at 2170. Accordingly, the Supreme Court held that Ledbetter's claim was untimely. *Id.* at 2172.

## C

*Bazemore* stands for the general proposition that an employment practice coupled with discriminatory intent within the charging period gives rise to a current violation of Title VII, even if related to past, uncharged discriminatory acts. *See Ledbetter*, 127 S. Ct. at 2174. The *Evans-Ricks-Ledbetter* line of authority stands for the proposition that an act within the charging period that gives present *effect* to past discriminatory acts, without more, does not give rise to a current violation. Hulteen's case turns on whether AT&T calculated her benefits in 1994 with the requisite discriminatory intent (*Bazemore*) or whether that calculation simply gave

effect through the NCS date of past, uncharged discriminatory acts (*Evans-Ricks-Ledbetter*).

In *Ameritech*, the Seventh Circuit found the *Evans* line of authority controlling because of the "fact, simplistic as it may seem, that [the] case involves computation of time in service —seniority by another name—followed by a neutral application of a benefit package to all employees with the same amount of time." *Ameritech*, 220 F.3d at 823. *Pallas* and the majority today, on the other hand, reached the contrary conclusion, finding that *Bazemore* was the "controlling Supreme Court precedent" for two reasons: "First, the discriminatory program which gave rise to this suit, the Early Retirement Opportunity, was instituted in 1987 . . . . Pallas challenges the criteria adopted in 1987 to determine eligibility for the new benefit program . . . . Second, the net credit system used to calculate eligibility under the Early Retirement Opportunity is not facially neutral. The system used to determine eligibility facially discriminates against pregnant women." 940 F.2d at 1327. With respect, *Pallas* was clearly wrong. The Supreme Court's logic in *Evans*, *Ricks*, and *Ledbetter* dictates the outcome of the case before us today.

1

The Supreme Court's most recent decision in *Ledbetter* confirms that under *Evans* "current effects alone cannot breathe life into prior, uncharged discrimination." *Ledbetter*, 127 S. Ct. at 2169. The charging period (here, the 180 days during which Hulteen was required to file a charge with the EEOC), "is triggered when a discrete unlawful practice takes place." *Id.* Such a discrete unlawful practice requires the coalescence of two elements: (1) an employment practice (defined as " 'a discrete act or single "occurrence' " that takes place at a particular point in time"); and (2) discriminatory intent. *Id.* at 2169, 2171. Here, the majority concludes that the AT&T's denial of benefits under the retirement plan in 1994 is an "employment practice." *Ante*, at 10041-42. But that

alone is insufficient. *Ledbetter* requires concurrent discriminatory intent.

a

*Pallas* concluded that the "NCS [seniority] system used to calculate eligibility under the [retirement plans] is not facially neutral. The system used to determine eligibility facially discriminates against pregnant women." 940 F.2d at 1327. Today, the majority locates discriminatory intent at the point AT&T calculated Hulteen's benefits in 1994 by embracing *Pallas*'s erroneous determination that the NCS seniority system is facially discriminatory and concluding that "[f]acial discrimination is 'by its very terms' intentional discrimination." *Ante*, at 10047 (citation omitted). The majority's position is erroneous.

AT&T's current NCS seniority system includes a facially nondiscriminatory and neutrally applied pregnancy leave rule that grants female employees who become pregnant after the enactment of the PDA full NCS seniority credit on the same terms as employees who become temporarily disabled. The retirement benefit plan under which Hulteen received retirement benefits is also facially nondiscriminatory and neutrally applied: calculation of eligibility and benefits under that plan are determined based on an NCS date maintained for each employee. That NCS date is also facially nondiscriminatory. But the majority asserts facial discrimination by looking long ago to the pre-PDA pregnancy leave rules that AT&T lawfully applied before the enactment of the PDA to adjust the NCS dates to grant only partial seniority credit for pre-PDA pregnancy leave. The majority's conclusion reaches too far.

The problem with the majority's conclusion that the NCS seniority system is facially discriminatory because the NCS date reflects AT&T's pre-PDA pregnancy leave rules is that it necessarily depends on a retroactive application of the PDA. Before the enactment of the PDA, the Supreme Court had

concluded in *Gilbert*, 429 U.S. 125, that classifications based on pregnancy involved *no facial gender-based discrimination*. *Id.* at 134-36, 138; *see also Nashville Gas Co. v. Satty*, 434 U.S. 136, 140 (1977) ("Petitioner's decision not to treat pregnancy as a disease or disability for purpose of seniority retention is not on its face a discriminatory policy."). *Pallas* concluded that the NCS seniority system was facially discriminatory because it "distinguishes between similarly situated employees: female employees who took leave prior to 1979 due to a pregnancy-related disability and employees who took leave prior to 1979 for other temporary disabilities." 940 F.2d at 1327. This conclusion therefore rests on a silent premise that gives impermissible retroactive effect to the PDA.

A system is facially discriminatory, of course, if it treats similarly situated employees differently. Hulteen asserts that, as a female employee who took pregnancy leave prior to the enactment of the PDA, she was treated differently from employees who took leave for other temporary disabilities during that same period. But these two groups are not similarly situated. Temporarily disabled employees were not female employees who took pregnancy leaves, but were female and male employees who took other types of disability leaves and, under the lawful seniority rules then in effect, were entitled to accrue seniority credit for the full duration of their leaves. And female employees who took pre-PDA pregnancy leaves under AT&T's then lawful pre-PDA pregnancy leave rules accrued seniority credit only for a portion of their leaves. While this may be regrettable in hindsight, because it was then lawful to distinguish between the two reasons for leaves prior to the PDA, the two groups were not similarly situated. AT&T's failure to award full seniority credit for pre-PDA pregnancy leaves could be labeled facially discriminatory only if employees in both groups were similarly situated. That would be true, however, only if the PDA were given impermissible retroactive effect. Because the PDA is *not* retroactive,[9] *Pallas* is wrong and the majority today is mistaken in

---

[9]*Landgraf v. USI Films Prods.*, 511 U.S. 244, 258 n.10 (1994) ("[I]n amending Title VII to bar discrimination on the basis of pregnancy in

concluding that AT&T's pre-PDA pregnancy leave rules were facially discriminatory in violation of Title VII. Accordingly, because the majority errs in concluding that the NCS seniority system is facially discriminatory in violation of Title VII, it necessarily errs in finding current discriminatory intent based on the 1994 calculation.

b

Straining to find discriminatory intent when AT&T calculated Hulteen's retirement benefits in 1994 based on the NCS date, the majority also asserts that Hulteen satisfies that burden by pointing to a single act by AT&T in crediting *another* employee's NCS date based on the pre-PDA pregnancy leave rules. *Ante*, at 10046. In 2000, AT&T credited Snyder's NCS seniority date for 30 days because previously her NCS date mistakenly had not been credited at all for her pregnancy leave in 1974. The majority extrapolates from this retroactive credit that "in the determination of benefits, AT&T does not simply rely on pre-PDA NCS calculations," but "reviews an employee's entire work history and affirmatively chooses to apply 'the policy at the time' that the leave occurred." *Ante*,

---

1978, Congress provided: 'Except as provided in subsection (b), the amendment made by this Act shall be effective on the date of enactment.' The only Courts of Appeals to consider whether the 1978 amendments applied to pending cases concluded that they did not. If we assume that Congress was familiar with those decisions, its choice of language in § 402(a) would imply nonretroactivity." (citations omitted)); *Ameritech*, 220 F.3d at 823 (recognizing that the PDA has not been treated as retroactive); *Whitehead v. Oklahoma Gas & Elec. Co.*, 187 F.3d 1184, 1193 (10th Cir. 1999) (concluding that the PDA is not retroactive); *Wambheim v. J.C. Penny Co.,* 642 F.2d 362, 363 n.1 (9th Cir. 1981) (concluding that the PDA did not apply in a case where the facts occurred before 1978); *Fields v. Bolger*, 723 F.2d 1216, 1219 n.4 (6th Cir. 1984) (noting that the PDA "was intended to be prospective only in application"); *Schwabenbauer v. Board of Ed. of School Dist. of Olean*, 667 F.2d 305, 310 n.7 (2d Cir. 1981) (concluding the PDA is not retroactive); *Condit v. United Air Lines, Inc.*, 631 F.2d 1136, 1139-40 (4th Cir. 1980) (same).

at 10046. Any contrary assertion, the majority contends, "is belied by this record." *Ante*, at 10046. But it is the majority's perception of discriminatory intent based on this isolated response to an error that is belied by the applicable standard of review.

While previously recognizing that " '[w]e must determine, viewing the evidence in the light most favorable to [AT&T], the non-moving party, whether [there are any genuine issues of material fact and whether] the district court correctly applied the substantive law,' " *ante*, at 10033 (second alteration in original) (quoting *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004)), the majority fails to apply that standard here. Viewing the evidence in the light most favorable to AT&T, as we must, the letters evidencing AT&T's crediting of Snyder's NCS date fail to demonstrate that, "when AT&T determines benefits eligibility, it reviews an employee's entire work history and affirmatively chooses to apply 'the policy at the time' that the leave occurred." *Ante*, at 10046. Rather, in the light most favorable to AT&T, that evidence suggests that AT&T relies on the pre-PDA NCS calculations, but in this one case an error came to light that required it to review Snyder's entire work history and to adjust her NCS date for a previously uncredited pre-PDA pregnancy leave. That evidence further suggests that AT&T reviewed Snyder's service record and adjusted her NCS date in response to her request, not as a matter of course for all employees: "In preparing *your claim for service credit* for the period of your maternity leave of absence for review by the Employees' Benefit Committee, it was determined that you were not given service credit for the first 30 calendar days of your leave (as was the policy at the time)." Moreover, the parties stipulated that "whether or not Snyder's NCS date was adjusted in the year 2000 does not affect the outcome of this [stage of the] proceeding."

The only thing that is " 'too obvious to warrant extended discussion,' " *ante*, at 10046 (quoting *Ledbetter*, 127 S. Ct. at

2173), is the majority's far-reaching efforts to infer the requisite discriminatory intent at the time AT&T calculated and/or denied retirement benefits. Simply put, the record fails to demonstrate that AT&T acted with discriminatory intent during the charging period.

2

There is no meaningful basis for distinguishing *Evans* and this case, which becomes abundantly evident when the key aspects of each case are compared. In both *Evans* and here, the employers maintained a host of employment programs[10] that determined eligibility based on a seniority system. Those benefit programs were facially nondiscriminatory and neutrally applied, but gave effect through the seniority system to past discriminatory acts. Evans's seniority was less because in early 1968 United maintained a policy that forced her to resign because she was female and because she married. Hulteen's seniority was less because AT&T maintained a pre-PDA pregnancy leave rule that forced her to take personal leave with only partial NCS seniority credit because she was female and because she became pregnant. Because of the past acts of discrimination, Evans and Hulteen had less seniority,[11] and, not surprisingly, the determinations of their benefits under those programs were adversely affected

Faced with "the question . . . whether the employer is committing a *second* violation of Title VII by refusing to credit her with seniority for any [prior] period," the Supreme Court concluded in *Evans* that "such a challenge to a neutral system

---

[10]In *Evans*, the seniority system "determine[d] a flight attendant's wages; the duration and timing of vacations; rights to retention in the event of layoffs and rights to re-employment thereafter; and rights to preferential selection of flight assignments." 431 U.S. at 555 n.5. In *Pallas*, as in this case, the NCS system was used for a host of employment-related purposes, including job bidding, shift preferences, layoffs, and eligibility for and calculation of certain benefit programs.

[11]Seniority, by its very nature, reflects past employment decisions.

may not be predicated on the mere fact that a past event which has no present legal significance has affected the calculation of seniority credit, even if the past event might at one time have justified a valid claim against the employer." 431 U.S. at 554, 560. Thinking itself the wiser, the majority adopts *Pallas*'s "contrary view," which, with respect, should be rejected because it "substitute[s] a claim for seniority credit for almost every claim which is barred by limitations." *Id.* at 560.

3

The majority repeats *Pallas*'s error by invoking *Bazemore* in this case. *See ante*, at 10035-37. *Bazemore* is simply inapposite. First, as the Supreme Court recently emphasized in *Ledbetter*, "*Bazemore* stands for the proposition that an employer violates Title VII and triggers a new EEOC charging period whenever the employer issues a paycheck using a discriminatory pay structure. But a new Title VII violation does not occur and a new charging period is not triggered when an employer issues paychecks pursuant to a system that is 'facially nondiscriminatory and neutrally applied.'" *Ledbetter*, 127 S. Ct. at 2174 (quoting *Lorance v. AT&T Technologies, Inc.*, 490 U.S. 900, 911 (1989)). As discussed above, Hulteen's retirement benefits were calculated pursuant to a facially nondiscriminatory and neutrally applied benefits plan, which relies upon the NCS date. That date, which is the product of the NCS seniority system, gives effect to the then-lawful pre-PDA pregnancy leave rules that granted only partial NCS credit for pre-PDA pregnancy leave. However, without having established discriminatory intent in 1994 when AT&T calculated benefits, *Bazemore* is of no help to Hulteen. As the Supreme Court emphasized in *Ledbetter*, "[t]he fact that precharging period discrimination adversely affects the calculation of a neutral factor (like *seniority*) that is used in determining future pay does not mean that each new paycheck constitutes a new violation and restarts the EEOC charging period." 127 S. Ct. at 2174 (emphasis added).

Second, in *Bazemore* the post-Title VII salary structure resulted in a fresh violation of Title VII because it was a "'*mere continuation*'" of the pre-Title VII discriminatory pay structure. *Ledbetter*, 127 S. Ct. at 2173 (quoting *Bazemore*, 478 U.S. at 397 n.6 (Brennan, J., joined by all other Members of the Court, concurring in part)). But in this case, AT&T's NCS seniority system is not the "mere continuation" of the pre-PDA pregnancy leave rules; indeed it was expressly amended to give full effect to pregnancy leave post-PDA. In *Bazemore*, a current violation existed because the Service paid black employees less than white employees for each new hour (week, month, or year) of work *after* the enactment of Title VII. In this case, no current violation exists: AT&T grants NCS seniority credit for each period of pregnancy leave after the enactment of the PDA, on the same terms as disability-related leave. Simply put, unlike in *Bazemore*, AT&T's pre-PDA pregnancy leave rules no longer apply to female employees who took pregnancy leave after the enactment of the PDA, which made such distinction based on pregnancy a violation of Title VII. *Bazemore* would only be analogous in this case if AT&T had continued to deny full NCS seniority credit to female employees who had taken pregnancy leave after the enactment of the PDA and attempted to defend that practice on the ground that it began before the enactment of that Act.[12] But AT&T did no such thing.

Finally, the majority's strained interpretation of *Bazemore* effectively imposes an unjustified burden on AT&T to remedy all acts of discrimination on the basis of pregnancy *before*

---

[12]For example, if a female employee took pregnancy leave in 1976, before the enactment of the PDA, and again in 1981, after the enactment of the PDA, the reasoning in *Bazemore* would apply only if AT&T continued to limit NCS seniority credit to 30 days (the maximum credit under AT&T's pregnancy leave rule in effect in 1976) for her pregnancy leave in 1981. However, AT&T grants full NCS seniority credit for pregnancy leaves taken after the enactment of the PDA. Accordingly, *Bazemore* is simply inapt here.

the enactment of the PDA. Because the PDA is not retroactive,[13] that is more than Congress required with the PDA. That is also more than the Supreme Court required in *Bazemore*. There, the Court held that "recovery may *not* be permitted for pre-[Title VII] acts of discrimination"; thus the Service was not required to pay retroactively the salary disparity for pre-Title VII discrimination. *Bazemore*, 478 U.S. at 395 (Brennan, J., joined by all other Members of the Court, concurring in part) (emphasis added). Indeed, the Supreme Court emphasized that its decision in *Bazemore* "in no sense gives legal effect to the pre-1972 actions, but, consistent with *Evans* . . . , focuses on the present salary structure, which is illegal if it is a mere continuation of the [pre-Title VII] discriminatory pay structure." *Id.* at 396 n.6. By requiring AT&T now to grant retroactive NCS seniority credit for pregnancy leave prior to the effective date of the PDA, the majority impose an entirely gratuitous burden upon AT&T to remedy the NCS seniority system with respect to all classifications based on pregnancy occurring before the enactment of the PDA. *Bazemore* provides no support for such arbitrary result.

## D

In sum, because there is no evidence that AT&T acted with the requisite discriminatory intent in 1994 when it calculated Hulteen's retirement benefits based in part on the NCS seniority system, *Bazemore* is inapposite. Without more, the NCS seniority system simply gives present effect to a past pre-PDA incident. Under *Evans* that pre-PDA incident is "merely an unfortunate event in history [with] no present legal consequences." 431 U.S. at 558. For this reason, the Supreme Court's logic in the *Evans* line of authority, reinforced weeks ago in *Ledbetter*, controls the outcome of this case. Under that line, "[a] new violation does *not* occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects result-

---

[13]*See* cases cited *supra* n.9.

ing from the past discrimination." *Ledbetter*, 127 S. Ct. at 2169 (emphasis added). The time for Hulteen to have challenged AT&T's pre-PDA pregnancy leave rules has long since expired.

IV

A

As the Seventh Circuit recognized in *Ameritech*, 42 U.S.C. § 2000-2(h) "offers good reason to treat seniority systems with special care, because it specifically exempts discriminatory effects that flow from *bona fide* seniority systems from the definition of unlawful employment practices, as long as the differences are not the result of an intention to discriminate." *Ameritech*, 220 F.3d at 823; *see also Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81 (1977) ("Seniority systems . . . are afforded special treatment under Title VII."). That section states:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this sub-

chapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.

42 U.S.C. § 2000e-2(h).

Section 2000e-2(h) provides AT&T no protection in this case if (1) AT&T's NCS seniority system is not a "bona fide" seniority system; or (2) the differences are a result of an intention to discriminate. Neither exception bars protection of AT&T's NCS seniority system here.

First, the Supreme Court held in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), that an otherwise valid seniority system did not lose its bona fide character simply because its operation may perpetuate past discrimination. *Id.* at 353-54. In *Teamsters*, the Supreme Court considered a seniority system that allegedly perpetuated the effects of pre-Title VII discrimination. *Id.* at 348. The employer's seniority system unmistakably advantaged white employees who had accumulated longer tenure because of the "employer's prior intentional discrimination" against "Negro and Spanish-surnamed employees" before the enactment of Title VII. *Id.* at 349-50. The Court stated that it "must decide, in short, whether [§ 2000e-2(h)] validates otherwise bona fide seniority systems that afford no constructive seniority to victims discriminated against prior to the effective date of Title VII." *Id.* at 349. And the Court concluded that, "[a]lthough a seniority system inevitably tends to perpetuate the effects of pre-Act discrimination in such cases, the congressional judgment [through § 2000e-2(h)] was that Title VII should not outlaw the use of existing seniority lists and thereby destroy or water down the vested seniority rights of employees simply because their employer had engaged in discrimination prior to the passage of the Act." 431 U.S. at 352-53. Thus, AT&T's NCS seniority system does not lose its bona fide characteristic

simply because it gives effect to the pre-PDA pregnancy leave rules that granted only partial NCS credit for pre-PDA pregnancy leave.

Second, under § 2000e-2(h), "[t]o be cognizable, a claim that a seniority system has a discriminatory impact must be accompanied by proof of a discriminatory purpose." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 69 (1982). But, as the Seventh Circuit held in *Ameritech*, "these employees cannot show the kind of intentional discrimination that would trigger the exception to the statutory protection afforded to seniority systems" because "prior to the adoption of the PDA an authoritative Supreme Court decision had held that Title VII did not prohibit distinctions based on pregnancy." 220 F.3d at 823 (citing *Gilbert*, 429 U.S. 125). Moreover, because the PDA is not retroactive, *see supra* n.9, AT&T "would have no reason to think it had to reshuffle its NCS list after the Act was passed," *Ameritech*, 220 F.3d at 823, and therefore the continued reliance on the unadjusted NCS date cannot constitute intentional discrimination.

### B

In an effort to frustrate reliance on § 2000e-2(h), the majority simply reads that provision out of the statute in all pregnancy discrimination cases. *Ante*, at 10048-51. The majority points to the PDA, which states that "women affected by pregnancy, . . . shall be treated the same for all employment related purposes, . . . as other persons not so affected but similar in their ability or inability to work, *and nothing in section § 2000e-2(h) of this title shall be interpreted to permit otherwise*" (the "§ 2000e-(2)(h) proviso"). 42 U.S.C. § 2000e(k) (emphasis added). While the majority's argument has surface appeal, that proviso cannot bear the burden it attempts to place upon it.

First, the majority's interpretation of that section completely removes the application of § 2000e-2(h) in all preg-

nancy discrimination suits under Title VII. *Ante*, at 10048-51. But Congress did not go so far. If Congress had intended wholly to prohibit the application of § 2000e-2(h) in all pregnancy discrimination cases, Congress would have expressed this intent more clearly, as it did with other provisions in the Civil Rights Act. *Compare, e.g.*, 42 U.S.C. § 2000a(e) ("The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section."); *id.* § 2000e-1(c)(2) ("Sections 2000e-2 and 2000e-3 of this title shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer.").

Second, the conclusion that Congress did not intend that proviso to remove § 2000e-2(h)'s protection for bona fide seniority systems in all pregnancy discrimination cases draws further support from the context in which Congress passed the PDA. "Congress enacted the Pregnancy Discrimination Act of 1978, amending Title VII to include pregnancy classifications within the statutory definition of sex discrimination," in response to the Supreme Court's decision in *Gilbert. See Toomey v. Clark*, 876 F.2d 1433, 1437 (9th Cir. 1989). By amending Title VII to define "because of sex" to include on the basis of pregnancy, the PDA "in effect overruled" *Gilbert*'s general holding that an employer's disability benefit plan did not violate Title VII because it excluded pregnancy-related disabilities. *Toomey*, 876 F.2d at 1437. By adding the § 2000e-2(h) proviso to the PDA, Congress did not intend to remove that section's protection of bone fide seniority systems in all pregnancy discrimination actions as the majority argues, but rather to address a specific anomaly suggested in *Gilbert*.

In *Gilbert*, the Supreme Court refused to defer to the EEOC's interpretation of Title VII to prohibit discrimination

on the basis of pregnancy, because it appeared to conflict with another agency's interpretation of the Equal Pay Act. 429 U.S. at 144-45. The last sentence of § 2000e-2(h), the so-called Bennett Amendment, was the source of the apparent conflict in *Gilbert*. The Bennett Amendment provides that "[i]t shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of [the Equal Pact Act, 29 U.S.C. § 206(d)]." 42 U.S.C. § 2000e-2(h). The Equal Pay Act, in turn, generally authorizes the payment of wages to employees at a lesser rate than the opposite sex "where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality or production; or (iv) a deferential based on any other factor other than sex" 29 U.S.C. § 206(d)(1), *quoted in Gilbert*, 429 U.S. at 412 n.21.[14] In *Gilbert* the Supreme Court interpreted the Bennett Amendment, in conjunction with an agency regulation under the Equal Pay Act, to permit under Title VII the exclusion of benefits under Title VII for pregnancy-related disabilities under an employer's disability plan. *Id.* 144-45. Considering itself "pointed in diametrically opposite directions by the conflicting regulations," the Supreme Court declined to grant deference to the EEOC's interpretation of Title VII to prohibit discrimination on the basis of pregnancy. *Id.* 145-46. For these reasons, Congress added the § 2000e-2(h) proviso to foreclose the possibility raised in *Gilbert* that the Bennett Amendment would permit wage discrimination under Title VII on the basis of pregnancy.

In sum, contrary to the majority's conclusion, the plain

---

[14]In *County of Washington v. Gunther*, 452 U.S. 161 (1981), the Supreme Court held that the Bennett Amendment incorporated into Title VII the four affirmative defenses of the Equal Pay Act in sex-based wage discrimination cases. *Id.* at 171.

meaning of the § 2000e-2(h) proviso in the PDA and the accompanying context establish that Congress did not intend to remove the protections of § 2000e-2(h) for bona fide seniority systems in all pregnancy discrimination actions. Congress, of course, was free to excise § 2000e-2(h) with respect to pregnancy discrimination actions. But the majority reads far too much into the § 2000e-2(h) proviso in the PDA, and therefore it is the majority, and not Congress, that renders that section wholly inapplicable in such actions.

## V

The majority also relies on 42 U.S.C. § 2000-5(e)(2) to shore up its conclusion that Hulteen's sex discrimination claim is timely. Congress added § 2000-5(e)(2) to Title VII with the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, 1078-79 (Nov. 21, 1991).[15] That section states in relevant part that

> an unlawful employment practice occurs, with respect to a seniority system that has been adopted for an intentionally discriminatory purpose in violation of this subchapter (whether or not that discriminatory purpose is apparent on the face of the seniority provision), when the seniority system is adopted, when an individual becomes subject to the

---

[15]The majority contends that the Civil Rights Act of 1991 simply "*clarified* that injury occurs at the time that the seniority system is applied to the aggrieved party because that is when the employee is actually harmed by the deprivation of benefits." *Ante*, at 10045 (emphasis added). But the Supreme Court recently rejected that view. *See Ledbetter*, 127 S. Ct. at 2169 n.2 ("The dissent attaches great significance to [the Civil Rights Act of 1991], suggesting that it shows that *Lorance* was wrongly reasoned as an initial matter. However, the very legislative history cited by the dissent explains that this amendment and the other 1991 Title VII amendments ' "*expand[ed]* the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination." ' " (emphasis and second alteration in original) (citations omitted)).

seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system.

42 U.S.C. § 2000-5(e)(2). As the Seventh Circuit succinctly put it in *Ameritech*, under § 2000-5(e)(2) "[i]f the employees are able to show intentional discrimination, their action accrues at the time they are *injured* by the seniority system— that is, when they are denied benefits."[16] *Ameritech*, 220 F.3d at 823 (emphasis added).

If that section were to apply here, Hulteen's sex discrimination action, of course, would have been timely. For § 2000-5(e)(2) to apply, however, Hulteen would have to establish that AT&T *adopted* its NCS seniority system "for an intentionally discriminatory purpose in violation of" Title VII. The majority boldly asserts that AT&T's seniority system intentionally discriminates against pregnant women because the NCS system " 'facially discriminates against pregnant women [because it] distinguishes between similarly situated employees' " and "[f]acial discrimination is 'by its very terms' intentional discrimination." *Ante*, at 10047 (quoting *Pallas*, 940 F.2d at 1327, and *Lovell v. Chandler*, 303 F.3d 1039, 1057 (9th Cir. 2002)). But the majority simply ignores the statutory requirement that Hulteen must show such intentional discrimination at the time the seniority system was *adopted*.

Contrary to the majority's assertion, § 2000-5(e)(2) cannot serve to revive Hulteen's sex discrimination charge in this case. Hulteen cannot show that AT&T *adopted* the pre-PDA pregnancy leave rules at the heart of this case with an inten-

---

[16]The majority asserts that "[t]he Seventh Circuit's analysis in *Ameritech* is problematic because, although it mentioned the Civil Rights Act of 1991, it failed to actually apply it." *Ante*, at 10047. Far from ignoring that Act as the majority suggests, the Seventh Circuit concluded that it did not apply because the employees failed to show discriminatory intent at the time the employer adopted the seniority system, a statutory prerequisite. *Ameritech*, 220 F.3d at 823.

tionally discriminatory purpose. *See also Ameritech*, 220 F.3d at 829 (holding that the "employees cannot show the kind of intentional discrimination that would trigger the exception to the statutory protection afforded to seniority systems"). First, the Supreme Court held in *Gilbert* that Title VII did not necessarily prohibit distinctions based on pregnancy before the enactment of the PDA. 429 U.S. at 145-56. There, the Supreme Court concluded that an employer's disability benefits plan did not violate Title VII because it failed to cover pregnancy-related disabilities. *Id.*[17] Second, the Supreme Court expressly held in *Gilbert* that classifications based on pregnancy were not facially discriminatory. *Id.* at 134-36, 138; *see also Satty*, 434 U.S. at 140 ("Petitioner's decision not to treat pregnancy as a disease or disability for purposes of seniority retention is not on its face a discriminatory policy."); *supra* pp. 10065-67. AT&T adopted the pregnancy leave rules at the core of this case before the PDA and changed those rules prospectively upon the enactment of the PDA in full compliance with the statute that changed the operative playing field previously defined by the Supreme Court. Accordingly, in light of these authoritative Supreme Court precedents, Hulteen cannot establish that AT&T *adopted* those pre-PDA pregnancy leave rules for an intentionally discriminatory purpose in violation of Title VII. *See Ameritech*, 220 F.3d at 823. Absent a showing of discriminatory intent at that time, § 2000-5(e)(2) does not apply in this case.

---

[17]While erecting a confusing benefits-burdens framework, in *Nashville Gas Co. v. Satty*, 434 U.S. 136, the Supreme Court reaffirmed *Gilbert*. There, the Court concluded that Title VII allowed an employer to deny benefits to female employees who became pregnant, but Title VII prohibited an employer from imposing on female employees who became pregnant a burden that men need not suffer. *Id.* at 142. Under that approach, the Supreme Court in *Satty* concluded that an employer's policy of requiring forfeiture of all *accumulated* seniority for female employees who became pregnant violated Title VII, *id.* at 138-43, but, reaffirming *Gilbert*, held that an employer's policy of not awarding sick-leave pay to female employees who became pregnant did not violate Title VII, *id.* 143-46.

## VI

As Judge Dumbauld lamented in his dissent to *Pallas*, we consider " 'a melancholy tale [o]f things done long ago, and ill-done.' " 940 F.2d at 1327 (Dumbauld, J., dissenting) (quoting John Ford, The Lover's Melancholy). Because *Pallas* invented a timely Title VII violation where the determination of benefits simply gave present effect to past, unchallenged acts, contrary to Supreme Court authority, it must be overruled. Because the majority today erroneously embraces *Pallas* and perpetuates a circuit split with the Sixth and Seventh Circuits, I must respectfully dissent.